308 A.2d 796.

STATE *vs.* ROBERT E. DUFFY AND WILLIAM H. HARDY, III.

AUGUST 21, 1973.

PRESENT: Roberts, C. J., Paolino. Kelleher and Doris, JJ.

KELLEHER, J. Today, the general agent for the Rhode Island Society for the Prevention of Cruelty to Animals is Lionel E. Hetu, a retired member of our State Police. However, on January 7, 1970, Hetu's pursuits were the prevention of crime and the apprehension of the criminal. On that date at approximately 5:30 p.m., Lieutenant Lionel E. Hetu was the commander of a motorized state police patrol whose area of responsibility encompassed the towns of Scituate, Coventry, Foster and Johnston. It had been a cold day and snow from a previous snowfall covered many of the roads.

At this particular time while traveling Route 116 in

Scituate, the officer received a radio message notifying him that the Johnston Police were seeking assistance relative to a housebreak that had just been discovered; that the thieves had fled the scene on foot; that they were believed to be armed; and that they were to be considered dangerous. Lieutenant Hetu first dispatched some of his men to Johnston and then proceeded to that area. After some minutes travel on such roads as Plainfield Pike and Peck Hill Road, the Lieutenant arrived in Johnston and came onto Shun Pike.

As he was traveling east, he saw before him, in his lane, a tank truck. It, too, was heading east. It had no lights, no rear registration plate and its radiator was steaming. The windows of the truck were covered with fog or steam. The Lieutenant left his vehicle, drew his revolver, opened the driver's door and pointed his revolver at the driver's head. The driver was Duffy. The occupant of the passenger's seat was Hardy. Duffy, who was no stranger to the officer, was carrying a loaded pistol. On the floorboard of the truck were jewelry and a pistol that was later identified as having been taken from the Johnston residence. A search of defendants uncovered some ammunition, more jewelry, and a cigarette lighter.

Later, a Superior Court jury found defendants guilty of breaking and entering a dwelling with the intent to commit larceny. The defendants concede that they might have entered the Johnston residence, but maintain that they were both so far under the influence of drugs and narcotics that they were incapable of forming the requisite intent. They argue this point and the denial of their motion to suppress as evidence certain articles. Some were taken from defendants, some from the truck, and some from an automobile.

The defense efforts to suppress the evidence seized on Shun Pike is premised on a lack of probable cause for the arrests of Duffy and Hardy.

Probable cause which would justify a warrantless arrest must be determined upon a realistic common-sense appraisal of the circumstances surrounding the arrest. *United States* v. *Ventresca,* 380 U. S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *State* v. *Durrell,* 111 R. I. 582, 305 A.2d 104 (1973); *State* v. *Nerney,* 110 R. I. 314, 292 A.2d 882 (1972). In order to establish probable cause, the state is not required to produce the quantum of evidence which is necessary for a conviction. The question is probable cause, not guilt beyond a reasonable doubt. *Draper* v. *United States,* 358 U. S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *State* v. *Doukales,* 111 R. I. 443, 303 A.2d 769 (1973); *State* v. *LeBlanc,* 100 R. I. 523, 217 A.2d 471 (1966). Probable cause exists when the facts and circumstances within the knowledge of the officer and about which he has trustworthy information are sufficient to warrant a person of reasonable caution to believe that the suspect has committed or was committing an offense. *Beck* v. *Ohio,* 379 U. S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Brinegar* v. *United States,* 338 U. S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *State* v. *McWeeney,* 100 R. I. 394, 216 A.2d 357 (1966).

The defendants concede that the absence of rear lights and license plate would have authorized a stopping of the tank truck. However, they contend that the abrupt cutoff of the truck and the drawn pistol indicated a felony arrest and they claim Lieutenant Hetu had no probable cause to believe that they had committed such a crime. We disagree.

In *State* v. *Wilson,* 110 R. I. 740, 297 A.2d 645 (1972), we observed that while some courts have held that information received by the arresting officer through official

channels can provide probable cause for an arrest only if the officer's testimony is supplemented by the officer supplying the information explaining how he obtained it. Other jurisdictions have found probable cause strictly on the basis of the communication. In *Whitely* v. *Warden, Wyoming State Penitentiary*, 401 U. S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), an arrest was made upon the receipt of a radio bulletin to apprehend the subject of an arrest warrant. The Court did not question that police were entitled to act on the strength of the radio message, "Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered to the magistrate the information requisite to support an independent judicial assessment of probable cause." *Id.* at 568, 91 S.Ct. at 1037, 28 L.Ed.2d at 313. The Court continued, "Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest."

Accordingly, we believe that information relayed to a police officer via police radio may provide probable cause to arrest. While it is true that Lieutenant Hetu did not have first-hand knowledge of what had transpired in Johnston, the existence of probable cause can be determined on the basis of the collective information available to the law enforcement organizations as a whole and not solely on that knowledge of the arresting officer. *Mattern* v. *State*, 500 P.2d 228 (Alas. 1972); *State* v. *Cobuzzi*, 161 Conn. 371, 288 A.2d 439 (1971).

When the motion to suppress was heard, a Johnston police officer told of how the homeowners reported the break, the theft of a rifle and the messages transmitted by his department. Lieutenant Hetu informed the trial judge that he stopped the truck because of (1) its missing rear

plate; (2) its proximity to the area of the crime; (3) its steaming radiator; and (4) the knowledge gained through years of police work that the thieves would attempt a motorized exit from the area.

In *Durrell* (the charge was possession of cannabis) we alluded to the part that the training and expertise of the arresting officer play in determining probable cause. We think that the same may be said of Lieutenant Hetu, a veteran of many years of patrolling the state highways. He had ample reason to act as he did when he apprehended defendants. He had a right to rely upon the information obtained by the Johnston police. He was justified in the light of the radio message he had received and what he observed on Shun Pike to stop the truck[1] to interrogate its occupants and to take reasonable means for his own protection. *Adams* v. *Williams,* 407 U. S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry* v. *Ohio,* 392 U. S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Although defendants express shock at the state policeman approaching the truck with a drawn pistol in his hand, we can only say that, while it would be ideal if a police officer's armament could be reduced to a beanbag or even a sling shot, the realities of the turbulent times in which we live will not permit such flights of fancy. Hetu's technique on that cold evening in January, 1970 affords an officer on highway patrol with some degree of assurance that when retirement time comes, he will be in reasonably good health. The articles found on the truck's floorboard and on defendants were taken as incident to a lawful arrest. *State* v. *Giragosian,* 107 R. I. 657, 270 A.2d 921 (1970).

Before proceeding further, we will give a cursory description of Duffy's actions on January 7, 1970. Duffy was a linotype operator for a local newspaper. He worked from

---

[1]The truck had been stolen from a nearby sand and gravel plant which was located on Shun Pike.

7 p.m. to 3 a.m. When he awoke at approximately 9:30 a.m. on January 7, he went about on a series of errands. Since it was payday, he drove to his place of employment, picked up his check, and cashed it. At this point, Duffy was driving a 1961 Cadillac that belonged to Raymond Iovino. Duffy was going to buy Iovino's Cadillac if it worked properly. He had given Iovino a down payment of $50. Sometime during the afternoon, Duffy went into an Olneyville restaurant where he met Hardy. Duffy told Hardy that he was on his way to meet his sister who lived in Scituate. Hardy replied that he would go with Duffy because he wanted to look up a "buddy" who lived at 16 Simmons Lake Drive, Johnston. The defendants entered the Cadillac and headed for Johnston. Duffy claims he does not know what happened after that.

Sometime later, at approximately 5 p.m. William St.-Laurent, a Johnston police officer, was ordered to investigate the presence of a suspicious car at 24 Simmons Lake Drive. When the officer approached the area, he observed Iovino's 1961 Cadillac in front of 1 Simmons Lake Drive on the wrong side of the road. At this point, the Johnston Police Communication Center informed Officer St. Laurent of the report by the owner of the break at 24 Simmons Lake Drive. Among the missing items were a television set, a stereo set and a rifle. The door of the Cadillac was open. A flashlight inspection of its interior showed a television set and a stereo set resting on the rear seat. The denial of the motion to suppress the items found on the Cadillac's back seat was proper. The objects fall within the "plain view" exception of the constitutional mandate relative to a search warrant in that the police officer had a prior justification for looking into the disabled vehicle during which he "inadvertently" came across a piece of evidence incriminating Duffy and Hardy. *Coolidge* v. *New*

*Hampshire,* 403 U. S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ; *State* v. *Wilson, supra.*

The Cadillac was impounded and removed to the Johnston Police Headquarters. The next day, a search of the car's trunk uncovered a variety of items including jewelry, ice skates, and some power tools. We see no need of discussing this phase of the denial of the motion to suppress. Even if we were to assume that the trial justice erred when he ruled that Duffy had no standing to question the search of the Cadillac, his action amounted to harmless constitutional error. *Chapman* v. *California,* 386 U. S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ; *State* v. *Danahey,* 108 R. I. 291, 274 A.2d 736 (1971). We see no possibility that the additional items found in the trunk contributed in any way to the guilty verdicts. There was ample tangible evidence, apart from the material seized on the January 8 search of the trunk, to incriminate defendants. The items seized by Lieutenant Hetu and the television and stereo sets seen by Officer St. Laurent were ample proof of defendants' entry into the Johnston home. In fact, the sole focus of the trial was on whether Duffy and Hardy, when they entered the home, had the requisite specific intent.

If Duffy and Hardy were to be believed, as they headed westward from Olneyville towards Johnston they were on a trip in more ways than one. Duffy claimed that once they arrived in Johnston, he became completely mesmerized because of a pill Hardy had given to him in the restaurant when he complained of a migraine headache. The pill was a "tab" of LSD. Hardy in turn claimed that he was on a trip of his own—not to Johnston but to the hallucinogenic world of LSD where, according to Hardy, his companion was Helen of Troy. Hardy described how, when he noticed the glassy-eyed condition of Duffy, he

steered the Cadillac while Duffy operated the brake and accelerator pedals.

Hardy, however, conceded that he remembered the Cadillac being impaled on the rock. He also remembered Lieutenant Hetu opening the truck door and thrusting his pistol into the driver's compartment. During their meanderings following the break, defendants stopped at the home of Raymond LaPerche and offered LaPerche some money if he would take his truck to Simmons Lake Drive and free the Cadillac. LaPerche testified that he went on the "rescue mission" but abandoned his efforts and left when he began to suspect the motives of the strangers. He testified that he heard Hardy offer to pay Duffy for the damages sustained by the car. Lieutenant Hetu told of how, as he transported defendants to the Scituate barracks, defendants expressed their concern as to what judge would arraign them.

While charging the jury, the trial justice alluded to defendants' attempt to excuse their conduct on the grounds that they were so far under the influence of drugs that they were incapable of forming the requisite specific statutory intent. He then informed the jury that in order for such an excuse to be accepted, defendants were bound to prove their inability to have a specific intent to commit larceny by the fair preponderance of the evidence. The defendants contend that this instruction relieved the state of its burden of proving the crime charged. We do not agree.

When a specific intent is an essential element of a crime, there is no such crime when the degree of the accused's intoxication is such that it negates his ability to formulate the requisite intent. *State* v. *Amaral,* 108 R. I. 755, 279 A.2d 428 (1971); *State* v. *Murphy,* 107 R. I. 737, 271 A.2d 310 (1970); *State* v. *Reposa,* 99 R. I. 147, 206 A.2d 213 (1965). When Duffy and Hardy claimed that their "trips"

would serve to excuse their conduct, it became their burden to adduce sufficient evidence from which a jury could find the necessary degree of drug intoxication which would warrant a finding that they were incapable of forming the specific intent to commit larceny. This is in the nature of an affirmative defense. *State* v. *Deans,* 93 R. I. 266, 174 A.2d 666 (1961). Long ago, this court in *State* v. *Ballou,* 20 R. I. 607, 40 A. 861 (1898), ruled that when a defendant claims justification for an act which but for the justification would be criminal, he must establish the justification by a preponderance of proof. So, too, we believe the rule to be when evidence of intoxication is being offered to negate a specific intent. *See* 1 Wharton, *Criminal Evidence* §32 (13th ed. 1972).

The charge as given, when viewed in its entirety, is almost identical to that affirmed by the court in *State* v. *Deans, supra.* The jury was told in clear and unmistakable terms that the burden was on the state to prove beyond a reasonable doubt a break and entry into the Johnston home together with an intent to commit larceny. As was said in *Deans,* "To hold that the assertion of such a defense (gross intoxication alcohol) did not require proof thereof by the defendant would be to cast upon the state the burden of proving beyond a reasonable doubt the existence of a fact that does not constitute an element of the crime. To place this burden upon the state * * * would do violence to the well-settled rule that in criminal cases the burden of the state extends no further than to prove beyond a reasonable doubt only the essential constituent elements of the offense charged." 93 R. I. at 273, 174 A.2d at 669.

In arguing this portion of their appeal, defendants have relied on *State* v. *Cuevas,* 53 Hawaii 110, 488 P.2d 322 (1971). There, the court in charging the jury embodied in its instructions a statute which reads:

"When the act of killing another is proved, malice aforethought shall be presumed, and the burden shall rest upon the party who committed the killing to show that it did not exist, or a legal justification or extenuation therefor." *Id.* at 323.

In faulting the charge and voiding the statute, the court in *Cuevas* pointed out that the statute does not merely impose upon a defendant the burden of going forward or a raising of a reasonable doubt, but obligates him to prove the nonexistence of an essential element of the crime of murder. The difference between *Cuevas* and the so-called *Deans* charge is obvious. The prosecution in the case at bar was under no obligation to prove that defendants were *not* so intoxicated that they were unable to form the requisite intent. That is a matter peculiarly within the knowledge of Duffy and Hardy. Nevertheless, defendants' burden of adducing sufficient evidence to establish the necessary degree of intoxication did not relieve the prosecution from proving beyond a reasonable doubt defendants' guilt of the crime charged, and this fact was made amply clear to the jury.

There is no error in the charge given.

The final exception relates solely to Hardy. He sought to adduce testimony that in the fall of 1969 he was a user of drugs. The defendant's witnesses were a teacher and a guidance counselor. After considering an offer of proof, the trial justice refused to allow the witnesses to testify. His refusal was based on remoteness. In rejecting the proposed testimony, the trial justice remarked that the issue was not whether he was a user of drugs but rather whether Hardy, as he meandered in and about the scene of the break, had the ability to form a specific intent to commit larceny. An objection to evidence based on its remoteness or irrelevance is addressed to the sound discretion of the trial court. *State* v. *Glass,* 107 R. I. 86, 265 A.2d 324 (1970); *State* v. *Reardon,* 101 R. I. 18, 219 A.2d 767

(1966). We can see no abuse of the discretion exercised in the trial court.

Apart from this, there was other evidence that Hardy had used drugs. The jury had the benefit of Hardy's testimony as to the nembutals taken on the night prior to January 7, 1970, the amphetamines and the LSD he had consumed. He spoke of some 12 "trips" he had taken. A photograph showing Hardy clutching his stomach is in evidence. The picture was taken in the State Police barracks. Hardy told the judge and jury this showed him in the withdrawal stages. LaPerche also testified as to seeing Hardy with his hand on his stomach. There was abundant evidence of Hardy's past experience with drugs, but the question was how high was Hardy on the late afternoon or evening of January 7, 1970? The jury found, and with reason, not high enough. We see no error in the trial justice's refusal to permit the teacher and the counselor to testify.

All of the defendants' exceptions are overruled and the case is remitted to the Superior Court.

Mr. Justice Joslin did not participate.

*Richard J. Israel*, Attorney General, *Donald P. Ryan*, Asst. Attorney General, *Edward E. Dillon, Jr.*, Special Asst. Attorney General, for plaintiff.

*William F. Reilly*, Public Defender, *Paul E. Kelley*, Asst. Public Defender, for defendants.