373 A.2d 489.

WILLIAM J. DANAHEY *vs.* STATE.

MAY 19, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

JOSLIN, J. In November 1968, William J. Danahey was tried before a jury in the Superior Court on an indictment charging him with the murder of his wife. He was found guilty of second degree murder, and on review his exceptions were overruled. *State* v. *Danahey*, 108 R.I. 291, 274 A.2d 736 (1971). In March 1975, almost 7 years after his trial, Danahey applied for postconviction relief on the ground of newly discovered evidence.[1] The application was denied by the same trial justice who presided at the 1968 trial. Danahey appealed.

The applicant, who had not testified at his 1968 trial, was the only witness to take the stand at the postconviction hearing. The substance of his testimony was that he was an alcoholic; that his drinking was excessive through-

---

[1]General Laws 1956 (1969 Reenactment) §10-9.1-1 (a)(4), as enacted by P.L. 1974. ch. 220, §3, provides for postconviction relief on the ground "that there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction * * * in the interest of justice."

out the fall of 1967; that during the weekend immediately preceding his wife's death he had been drinking fairly steadily and had also been taking valium; that he remembered going to Blackstone, Massachusetts on Sunday morning, January 14, 1968, to visit his daughter's grave and that en route to the cemetery he drank "a couple of * * * nips" of vodka.[2] He further testified that he did not remember returning home from the cemetery, packing his bags, quarreling with his wife and killing her, writing a note,[3] or leaving the state. His only other recollections of the events of the day were of checking into an inn in Amherst, Massachusetts on Sunday night after having been driven there in his own automobile by a man who told him that he (applicant) had picked him up hitchhiking and had asked him to drive. The next day, Monday, January 15, while lunching with a business acquaintance in Westfield, Massachusetts, applicant had "a couple of drinks." His next recollection was of awakening in a hospital in Albany, New York, on Monday night. He then learned that he had been in an automobile accident, but he had no memory either of the accident or of driving to Albany. Nor did he know of his wife's death until he was told of it by the Albany police officers who arrested him.

The applicant explained that the reason he did not remember most of the events of those several days was

---

[2] A nip contains 2 ounces.

[3] The note found next to the wife's body and admitted into evidence at the trial, as quoted in *State* v. *Danahey*, 108 R.I. 291, 293 n.1, 274 A.2d 736, 737 n.1 (1971), reads:

" 'Kids,

" 'Sorry I had to do this. When you find me I'll be dead too. It's better this way.

" 'Bill

" 'I loved her too much and couldn't take any more from her and can't take any more pain. Again I know you will never forgive me but I'm sorry.' "

not that his memory of them had grown hazy with the passage of time, but rather that he had never remembered them—they were a complete blank to him. He also testified that he had twice in the past experienced similar blackouts while drinking. One occurred in November 1967, when he had awakened "in a drunk tank" in Miami, Florida, without knowing what had led to his being there. On that occasion his automobile was found at Logan Airport in Boston, but he did not remember either driving there or flying to Miami. On another occasion, again marked by heavy drinking, he left his sister-in-law's home in New Jersey and "came to" almost 2 weeks later in Buffalo, New York, with no memory of anything that had happened in the interim.

We have referred at some length to applicant's testimony of his limited recollections of the events immediately preceding and following his wife's death in order to provide a factual context for his contention that allegedly new scientific knowledge concerning alcoholism and alcoholic blackouts constitutes newly discovered evidence that entitles him to postconviction relief. To substantiate that contention, he relies on the affidavits of Roswell Johnson, a medical doctor, and Alan Willoughby, a professor of psychology.[4]

Doctor Johnson's affidavit states that, in his opinion, applicant was suffering from a severe case of alcoholism at the time of his wife's death; that alcoholism is a disease,

---

[4]General Laws 1956 (1969 Reenactment) §10-9.1-4, as enacted by P.L 1974, ch. 220, §3, provides in pertinent part that supporting affidavits "shall be attached to the application or the application shall recite why they are not attached." In this case, no affidavits were attached to the application, which explains that "it is the applicant's position that all evidence in support of this application would be better presented at hearing rather than in affidavit form." Neither in the Superior Court nor here, however, has the state objected to consideration being given to the contents of the Johnson and Willoughby affidavits.

one symptom of which is that a single drink may trigger a further involuntary consumption of alcohol; that the alcoholic blackout is a condition experienced by some, but not all, alcoholics; that a person in a blackout state suffers loss of memory; and that the duration of a blackout, which can be hours or days, depends on when the intake of alcohol ceases. The affidavit further says that an alcoholic who suffers a blackout, though capable of carrying on practically any activity while in that state and often appearing to be completely normal, will nonetheless have no subsequent recollection of what occurred during the blackout.

Professor Willoughby's affidavit confirms Dr. Johnson's and states in addition that a person in a blackout condition may "behave in ways which can be either 'normal' or 'abnormal' but for which there is no possible recall," and that such a person may perform a complicated act such as driving an automobile or engage in any other class of behavior, including the commission of a crime, without the ability to remember it.[5]

Although our reading of applicant's brief left us somewhat in doubt as to the precise nature of his argument, his counsel made it clear at oral argument that his theory of the case is that the paucity of medical and scientific knowledge concerning alcoholic blackouts in 1968 effec-

---

[5]Though not a matter of record, a 1971 review of the literature on alcoholic blackouts supports and elaborates upon the statements of Dr. Johnson and Professor Willoughby. Ryback, *The Continuum and Specificity of the Effects of Alcohol on Memory*, 32 Q.J. Stud. on Alcohol 995 (1971). Doctor Ryback records scientific experiments which demonstrate that a person in a blackout state has unimpaired immediate memory (the ability to remember an event 1 or 2 minutes after its occurrence), but no short-term memory (the ability to remember an event more than 2 minutes after its occurrence). *Id.* at 996. This disruption of short-term memory, the author says, prevents long-term memory storage and thus results in an alcoholic blackout. *Id.* at 1004.

tively, if not legally, precluded applicant from asserting at his trial the well-established defense of diminished capacity due to intoxication. That defense is available when the crime charged includes a specific intent as one of its essential elements, for such a crime cannot be committed if the actor is so intoxicated that he cannot entertain the requisite intent. *State* v. *Duffy*, 112 R.I. 276, 284, 308 A.2d 796, 801 (1973); *State* v. *Reposa*, 99 R.I. 147, 149, 206 A.2d 213, 214-15 (1965). Although this court has not yet had occasion to consider the application of this principle as a defense to homicide, there is authority that evidence of intoxication may reduce the offense either from first to second degree murder or from murder to manslaughter. *People* v. *Conley*, 64 Cal. 2d 310, 324-26 n.4, 411 P.2d 911, 920-21 n.4, 49 Cal. Rptr. 815, 824-25 n.4 (1966); Perkins, *Criminal Law* 902-04 (2d ed. 1969).

Presentation of that defense at his trial, applicant argues, would have required him to testify personally concerning the extent of his imbibing immediately prior to his wife's death, because there were no other witnesses to that drinking. Once on the stand, however, he would have been forced to admit that he had no memory of killing his wife and very little memory of his actions immediately preceding and following her death. No jury, he contends, would have believed that testimony unless it were reinforced by expert testimony that the alcoholic blackout is a known phenomenon and that applicant's drinking on the fatal weekend could have triggered one. He argues that in 1968 the alcoholic blackout was not recognized as a medical fact and that the consequent unavailability of the requisite supporting testimony militated against his testifying, thereby effectively causing him to abandon the defense of diminished capacity due to intoxication. Today, however, according to applicant, scientific understanding of alcoholic blackouts has greatly increased; indeed, that

present-day understanding is the newly discovered evidence upon which he relies. With its assistance, he says, he could, if granted a new trial, present the defense of diminished capacity intelligently and with some hope of success. The argument is novel and interesting, but on this record hardly persuausive.

It lacks persuasiveness because a grant of postconviction relief on the ground of newly discovered evidence requires a showing, *inter alia,* that the evidence has actually been newly discovered since the trial and that in the exercise of ordinary diligence it could not have been ascertained in time to be presented at the trial. *State* v. *Lanoue,* 117 R.I. 342, 346, 366 A.2d 1158, 1160 (1976). In this case, however, the applicant has failed to establish that scientific evidence concerning alcoholic blackouts was unavailable in 1968. Indeed, the only evidence he submitted to support his claim of pre-1968 scientific ignorance is in the affidavits of Professor Willoughby and Dr. Johnson, and those affidavits are completely inadequate for that purpose. Although Professor Willoughby states that blackouts are "much more common than we used to believe," he says nothing about the state of scientific knowledge of the subject in 1968. Doctor Johnson's affidavit is of no greater assistance. It states that "[t]he research that has been done [since about 1965] has * * * greatly increased our understanding of what a blackout is." It may well be that scientific understanding of alcoholic blackouts is better now than it formerly was, but nothing in Dr. Johnson's affidavit or elsewhere in the record indicates that scientists were unaware of the existence of alcoholic blackouts at the time of the applicant's trial. Indeed, our own brief independent research has revealed numerous refer-

ences to the phenomenon in pre-1968 literature.[6] In short, the applicant has not satisfied us that there was a dearth of available expertise on the subject of alcoholic blackouts in 1968 or that scientific support for the blackout claim that he first advanced in 1975 would not have been found if it had been searched for in 1968. For these reasons, what is here claimed as newly discovered evidence does not entitle the applicant to the postconviction relief he seeks.

The applicant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remitted to the Superior Court for further proceedings.

*Louis F. Robbio, Peter P. D'Amico*, for William J. Danahey.

*Julius C. Michaelson*, Attorney General, *John R. McDermott*, Special Asst. Attorney General, for the State.

---

[6]Keller & Seeley, *The Alcohol Language* 20 & n.12 (reprinted ed. 1963) (defining "blackout" as "[a]mnesia for the events of any part of a drinking episode, without loss of consciousness"); Armstrong, *Alcohol, Amnesia and Awareness: A Critique*, 20 Q.J. Stud. on Alcohol 781 (1959); Diethelm & Barr, *Psychotherapeutic Interviews and Alcohol Intoxication*, 23 Q.J. Stud. on Alcohol 243, 246-47 (1962); Feeney, Midlin, Minear & Short, *The Challenge of the Skid Row Alcoholic*, 16 Q.J. Stud. on Alcohol 645, 659 & n.15 (1955); Hall, *Intoxication and Criminal Responsibility*, 57 Harv. L. Rev. 1045, 1080 n.141 (1944); Hutchison, Tuchtie, Gray & Steinberg, *A Study of the Effects of Alcohol on Mental Functions*, 9 Can. Psych. A.J. 33, 40-41 (1964); Jellinek, *Phases of Alcohol Addiction*, 13 Q.J. Stud. on Alcohol 673, 678-79 (1952); Jellinek, *Phases in the Drinking History of Acoholics*, 7 Q.J. Stud. on Alcohol 1, 13 (1946); Lennox, *Amnesia, Real and Feigned*, 10 U. Chi. L. Rev. 298, 299 (1943); Storm & Smart, *Dissociation: A Possible Explanation of Some Features of Alcoholism, and Implication for Its Treatment*, 26 Q.J. Stud. on Alcohol 111, 112-13 (1965); Trice & Wahl, *A Rank Order Analysis of the Symptoms of Alcoholism*, 19 Q.J. Stud. on Alcohol 636, 637-39, 642-43 (1958); Washburne, *Alcohol, Amnesia and Awareness*, 19 Q.J. Stud. on Alcohol 471, 478-81 (1958); Note, *Volitional Fault and the Intoxicated Criminal Offender*, 36 U. Cinn. L. Rev. 258, 259 (1967).