**Alfred DUFRESNE, Petitioner, Appellee,**

v.

**John MORAN, Respondent, Appellant.**

**No. 83–1540.**

United States Court of Appeals,
First Circuit.

Argued Nov. 8, 1983.

Decided March 1, 1984.

Rehearing and Rehearing En Banc
Denied April 11, 1984.

Sharon O'Keefe, Sp. Asst. Atty. Gen., Chief, Appellate Division, Providence, R.I., with whom Dennis J. Roberts II, Atty. Gen., Providence, R.I., was on brief, for respondent, appellant.

Edward L. Gerstein, Providence, R.I., with whom Gerstein & Stolle, Providence, R.I., was on brief, for petitioner, appellee.

Before CAMPBELL, Chief Judge, SWYGERT,* Senior Circuit Judge, and BOWNES, Circuit Judge.

SWYGERT, Senior Circuit Judge.

This is an appeal from the grant of a petition for habeas corpus. We reverse.

I

Petitioner-appellee Alfred Dufresne was indicted on November 19, 1976 for murder in the first degree of his ex-wife, Sheila Dufresne. (Sheila was granted an interlocutory decree divorcing her from petitioner approximately one month before the incident.) The case proceeded to trial on April 6, 1977, and the State's evidence unfolded as follows.

At approximately 8:40 a.m. on November 6, 1976, Dufresne appeared at the Providence Police Station and approached the desk sergeant on duty, John Brady. Claiming that he had "a problem," Dufresne removed a .22 calibre gun from his waistband. Dufresne stated, "I shot my wife." Brady took the gun and instructed Patrolman Perry Wheeler to arrest Dufresne. Brady then instructed a third officer to dispatch a rescue unit to the home of Sheila Dufresne. Dufresne responded to this instruction, "It's too late, I shot her three times." Brady testified that Dufresne was neatly dressed, did not appear to have been drinking, and that there was no odor of alcoholic beverages on his breath. Wheeler testified that Dufresne appeared calm and walked steadily without assistance.

Police officers were dispatched to the apartment of Sheila Dufresne. Sheila was found dead, lying face down on the kitchen floor. Police observed that the apartment door was damaged and concluded that it had been forced open. A screwdriver, some wood chips, a bottle of peach brandy, and some shell casings were seized from the apartment.

The state medical examiner testified that Sheila sustained three bullet wounds and that the fatal wound was from a bullet that entered the back of her head and passed through her brain. The examiner concluded that death was a homicide caused by a gunshot wound from a pistol fired at close range. The examiner stated that no alcohol or drugs were found in Sheila's body. A ballistics expert identified the shell casings and the bullets as those fired from the .22 calibre pistol that Dufresne turned over to Officer Brady at the police station.

Sheila's next door neighbors, Wilma Brophy and her daughter, Barbara Brophy, also testified. Mrs. Brophy stated that Sheila and Alfred had been separated since November 1975. She indicated that the couple had a stormy relationship with frequent episodes of violence and physical assaults perpetrated by both parties. Wilma and Barbara Brophy were in a car outside Sheila's apartment at approximately 8:30 a.m. on the day of Sheila's death. Mrs. Brophy heard loud noises from the direction of the apartment and sent Barbara upstairs to get Sheila. Barbara testified that she looked in the door of Sheila's apartment and saw Alfred Dufresne standing in the kitchen with a gun in his hand. At that point, Mrs. Brophy called to Barbara and Barbara returned to the car.

Shortly thereafter, Alfred apparently left the apartment and went to the Standard Tap, a local bar. Thomas Hathaway, the bartender, testified that Dufresne entered the bar that morning between 8:30 and 9:00 a.m. He served Dufresne two double shots of whiskey and two sixteen-ounce beers in a short period of time. While at the bar, Dufresne told Hathaway that he had shot and killed his wife and asked Hathaway to accompany him to the police station. Hathaway refused, and Dufresne left. Hathaway stated that he knew Dufresne to be a heavy drinker, that Dufresne was generally unaggressive and quiet even while drinking, and that Dufresne appeared to have "had a drink" that morning.

* Of the Seventh Circuit, sitting by designation.

Finally, the State presented the testimony of Sergeant Lloyd Allen and Detective Edward Trafford concerning two oral confessions made by Dufresne following his arrest. Defense counsel contested their admissibility under *Miranda* during the trial, but the motions to suppress the confessions were denied by the court. According to the testimony, Dufresne was brought upstairs to the detective division following his arrest where he was first informed of his *Miranda* rights. Dufresne refused to sign a waiver form but agreed to answer questions. A prepared witness statement form recorded the following questions and answers:

First: "Alfred, we are investigating a report by you that you had shot your wife. Is it true that you made this statement to officers when you arrived at the station?"

Answer: "Yes, this is the truth, but I wouldn't sign it."

Second: "Why did you shoot your wife?"

Answer: "Twelve months of aggravation. I lost forty-five pounds."

Third: "Is it also true that you brought a gun with you to the station and gave this to one of the officers at the counter?"

Answer: "Right."

Fourth: "Can you describe the gun, please?"

Answer: "It wasn't mine. It didn't belong to me."

Fifth: "Is that the gun that you shot Sheila with?"

Answer: "I don't know."

Dufresne then indicated that he did not want to talk further until he obtained a briefcase from his apartment that would explain "why this all happened." The briefcase was finally located, but the contents revealed nothing relevant to Sheila's death.

Dufresne was left alone in the police station for approximately twenty minutes. He was then readvised of his *Miranda* rights and asked to give a written statement. Dufresne again refused to give a written statement but agreed to answer questions verbally. Dufresne told the detectives that he broke into Sheila's apartment two days prior to the killing. He placed the gun under her pillow and awaited her return. When Sheila returned, the two had an argument and Sheila reached for the phone to call the police. Dufresne then grabbed the gun from under the pillow and attempted to fire but the safety was on; he removed the safety and fired at Sheila. When she fell to the floor, he shot her again in the back of the head.

After this evidence was presented by the State, the parties agreed to a plea bargain. On April 12, 1977, Dufresne pleaded guilty to second degree murder. The plea was accepted by the court and Dufresne was sentenced to forty years at the Adult Correctional Institution, with twenty-five years to serve, and fifteen years probation thereafter. A motion to reduce the sentence was filed by Dufresne's trial counsel which was denied.

In September 1979, Dufresne filed an application for post-conviction relief in the Rhode Island trial court, claiming that his guilty plea was the result of ineffective assistance of counsel. The court held a hearing on the matter. At the hearing, a doctor from St. Joseph's Hospital testified that he treated Dufresne for acute pancreatitis at approximately 2:00 a.m. on November 7, 1976. This was approximately seventeen hours after Sheila was shot and approximately fourteen hours after the conclusion of discussions between Dufresne and police detectives. The doctor stated that Dufresne was clearly inebriated when admitted to the hospital and concluded that the pancreatitis was caused by excessive amounts of alcohol consumed six to eight hours before his admission to the hospital.

Dufresne's trial counsel, Sanford Gorodestsky, also testified. After spending the morning at the police station uncounseled (despite being told of his right to be represented by an attorney), Dufresne finally requested the presence of Gorodetsky. Gorodetsky explained that he had known Dufresne for some years and had provided

various legal services for both Sheila and Alfred Dufresne in the past.

Gorodetsky arrived at the police station sometime after noon on November 6, 1979. He spent most of the time trying to comfort Dufresne who appeared "visibly shaken." Gorodetsky stated that he originally had no intention of representing Dufresne in a criminal prosecution and suggested to Dufresne that he contact the Public Defender's Office. Gorodetsky left Dufresne at the police station after advising him not to make any statements to the police. Gorodetsky then learned that Dufresne had already given oral statements; he also learned that the police officers gave Dufresne a drink at the police station. Gorodetsky testified that Dufresne appeared to have been drinking but did not appear intoxicated. Gorodetsky claimed that Dufresne, in fact, denied being intoxicated. Gorodetsky was also present at the arraignment which took place at St. Joseph's Hospital. At some point thereafter, Gorodetsky decided to undertake the representation of Dufresne.

Gorodetsky's notes concerning the case were vague and incomplete. He stated that he recalled meeting with Dufresne three or four times prior to trial and that there were probably other meetings as well. He recalled almost nothing of what transpired during these meetings. He claims to have interviewed the bartender at the Standard Tap, several police officers involved in the case, and some staff members at St. Joseph's Hospital where Dufresne was admitted the night after his arrest. Gorodetsky could recall very little of these interviews.

The only pretrial motion was one for reduction of bail. There was no formal discovery, although Gorodetsky apparently had free access to most of the state's file in the case. Gorodetsky testified that his strategy was to gain a reduction in the first degree murder charge by assassinating Sheila's character. Towards this end he prepared a subpoena for Leonard Golden, a man whom Sheila was allegedly with the night before the incident. Gorodetsky never spoke with Golden prior to trial. Gorodetsky claimed that he repeatedly sought to negotiate a plea bargain for Dufresne, but that the State was unwilling to negotiate until it had presented most of its case. At that point, the State agreed to accept a plea to second degree murder carrying a forty-year sentence with fifteen of those years suspended. Gorodetsky successfully counseled Dufresne to accept this bargain.

Finally, a lawyer from the Public Defender's Office testified at the post-conviction hearing that on the facts of Dufresne's case, he would have filed motions for pretrial discovery, moved to suppress Dufresne's statements on the basis of involuntariness, conducted an independent investigation including interviewing the medical examiner and other witnesses for the state and consulting an independent ballistics expert, and conferred with the accused between ten and twenty times. In the opinion of the public defender, intoxication was a viable defense in Dufresne's case.

On the basis of the trial record and the foregoing testimony, the state court made the following findings of fact:

1. No pre-trial motions were filed in this case.

2. Counsel had not filed a motion to suppress incriminating statements elicited from the defendant, even though there was evidence from the defendant and others that he was highly intoxicated when admitted to the hospital from the police station. Further, that he had been drinking before going to the police station and while at the police station.

3. That counsel had not interviewed witnesses who might have been called for the defendant.

4. That counsel was unable to fix the date of any interview with a State's witness, nor was he able to produce a written summary of any such interview.

5. That counsel's interview of witnesses was limited to a bartender, several police officers that were involved and personnel of the alcoholic section of the Institute of Mental Health.

6. That counsel did not confer with any expert in either ballistics or pathology in preparation of his case.

7. That counsel did not visit the crime scene.

8. That counsel conferred with the defendant personally on three or four occasions before trial for unspecified periods of time.

9. That counsel did not interview Leonard Golden whom it is urged had left the decedent at her home shortly before the shooting nor did he discuss this individual with his client, even though he was aware of his name and address.

10. That counsel did not discuss drunkenness with the defendant as a defense or as an attack on the voluntariness of his confession, even though medical reports indicated he had been intoxicated.

11. That counsel did not move pursuant to Rule 26.1 for the production of former statements.

*State v. Dufresne,* No. 76–1350, Supp.Op. at 6–8 (R.I.Super. May 8, 1980). In addition, the court found "as a fact that the attorney did not recognize and appreciate that intoxication was either a potential defense to murder in the first degree or that intoxication was material to the issue of the voluntariness of [Dufresne's confessions]." *Id.* at 12.

The court compared this conduct with the American Bar Association Standards for Criminal Justice, the testimony of the Public Defender, and its own experience with criminal trials and concluded that the conduct of Dufresne's counsel fell measurably below that which is in the range of competence expected of attorneys in criminal cases. *Id.* at 12–14. The court further found that the advice to plead guilty was tainted by counsel's incompetence in pretrial preparation and investigation. The court concluded that Dufresne had shown the likelihood that the omissions of counsel affected the outcome of the trial and that the state did not negate this showing of prejudice. *Id.* at 16–18. The court granted Dufresne's application for post-conviction relief.

The Rhode Island Supreme Court reversed. The court held that pretrial preparation and investigation were irrelevant as a matter of law. The inquiry, according to the court, must focus on whether the state of the evidence warranted a guilty plea and "it is not our concern how that sum of evidence came to exist." *State v. Dufresne,* 436 A.2d 720, 724 (R.I.1981).

On December 11, 1981, Dufresne filed a petition for a writ of habeas corpus in the District Court for the District of Rhode Island. The district court rejected the "incongruous result" of the reasoning of the Rhode Island Supreme Court:

A defense counsel, through various failures, errors and omissions of representation, may leave his client with little option but to enter a guilty plea; but the history of counsel's assistance is to be forever sealed.... The reliance on *McMann* and *Tollett* in fashioning a guilty plea as an impenetrable barrier to review is misplaced. *McMann* itself makes clear that when entering a guilty plea a defendant is entitled to the effective assistance of counsel.

*Dufresne v. Moran,* 572 F.Supp. 334, 341 (D.R.I.1983). The court accepted the findings of fact made by the state trial court in its post-conviction hearing because those findings were undisturbed on appeal to the state supreme court. On the basis of these facts, the court concluded that Dufresne "did not receive reasonably competent assistance from his counsel in the pre-trial preparation and investigation of his case," *id.* at 343, citing counsel's failure to meet frequently with his client or inform his client about the case, to interview available and potential witnesses, to move to discover Dufresne's confessions to police, to investigate the scene of the crime, and "foremost," to investigate intoxication as a possible defense, *id.* at 343–44.

The court then addressed the issue of prejudice, concluding: "This is an instance ... where it is not appropriate to require Petitioner to show, specifically, how he was injured by the delinquency of his attorney. In light of the number and quality of coun-

sel's omissions prejudice may be presumed." *Id.* at 344–45. The district court granted Dufresne's habeas petition.

## II

We believe that our decision is bound by *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). In *McMann*, the Supreme Court denied a habeas petitioner's claim to withdraw a guilty plea, stating:

> [A defendant] is bound by his plea and conviction unless he can allege and prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act.

*Id.* at 774, 90 S.Ct. at 1450. *See also Tollett v. Henderson*, 411 U.S. 258, 266–67, 93 S.Ct. 1602, 1607–08, 36 L.Ed.2d 235 (1973); *Parker v. North Carolina*, 397 U.S. 790, 797–98, 90 S.Ct. 1458, 1462, 25 L.Ed.2d 785 (1970). Under *McMann*, Dufresne was required to show both that counsel's representation fell below a standard of "reasonably competent assistance," *United States v. Bosch*, 584 F.2d 1113, 1121 (1st Cir.1978), and that counsel's incompetency rendered the defendant's decision to plead guilty an unknowing and unintelligent act.

■ The district court found that counsel's representation was not reasonably competent. We do not dispute that finding. We also agree with the district court's rejection of the analysis of the Rhode Island Supreme Court. The constitutional mandates that a criminal defendant be provided with effective assistance of counsel, *see McMann v. Richardson, su-*

pra, 397 U.S. at 771 n. 14, 90 S.Ct. at 1449 n. 14; *United States v. Bosch, supra,* 584 F.2d at 1119, and that a plea of guilty be a knowing and intelligent act, *see Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969), require consideration of how a sum of evidence came to be. If a defendant can show that certain evidence would not have been admitted but for counsel's incompetence and that the evidence actually influenced the defendant's decision to accept a guilty plea agreement, the defendant must be allowed to withdraw the plea because counsel's incompetence rendered the plea an unknowing and unintelligent act. *See McMann v. Richardson, supra,* 397 U.S. at 774, 90 S.Ct. at 1450; *Gioiosa v. United States,* 684 F.2d 176, 179–80 (1st Cir.1982).

Our basic disagreement with the decision below concerns the second prong of *McMann.* The second prong required Dufresne to establish that his decision to plead guilty was actually and materially influenced by counsel's errors. *See Cepulonis v. Ponte,* 699 F.2d 573, 577 (1st Cir. 1983); *United States v. Garcia,* 698 F.2d 31, 33 (1st Cir.1983). We find that the requisite connection between counsel's errors and Dufresne's decision to plead guilty was not established in this case.

The defect in the district court's opinion was in the standard applied. The court did not stop after determining that Dufresne's counsel was incompetent; it also undertook a prejudice analysis. While a sixth amendment prejudice analysis (which has been adopted in the majority of circuits) may satisfy *McMann*'s second prong,[1] *see Ford v. Parratt,* 638 F.2d 1115, 1118 (8th Cir.),

---

1. In *United States v. Bosch, supra,* 584 F.2d at 1123, this court stated that it would "leave for another day" the issue of whether prejudice is a necessary element of an ineffective assistance of counsel claim. *See also Cepulonis v. Ponte, supra,* 699 F.2d at 516 n. 4. *But see United States v. Campa,* 679 F.2d 1006, 1014 (1st Cir.1982) (appellant claiming ineffective assistance of counsel "bears the burden of establishing actual prejudice") (citing *United States v. Ritch,* 583 F.2d 1179, 1183 (1st Cir.), *cert. denied* 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978)). We do not decide that issue here. We only point out that a prejudice analysis is one method of satisfying Supreme Court precedent concerning withdrawals of guilty pleas on the basis of ineffective assistance of counsel. We continue to leave the broader sixth amendment issue of prejudice for "another day," anticipating possible guidance forthcoming from the Supreme Court, *see Washington v. Strickland,* 693 F.2d 1243 (5th Cir.1982) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983); *United States v. Cronic,* 675 F.2d 1126 (10th Cir.1982), *cert. granted,* 459 U.S. 1199, 103 S.Ct. 1182, 75 L.Ed.2d 430 (1983).

*rev'd and remanded on other grounds,* 454 U.S. 934, 102 S.Ct. 467, 70 L.Ed.2d 242 (1981), *on remand,* 673 F.2d 232 (8th Cir. 1982) ("where the defendant enters a guilty plea, the issue of prejudice necessarily centers upon whether the attorney's failure to competently investigate any material facts prejudiced the defendant's ability to make an intelligent and voluntary plea of guilty"), *cert. denied,* 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982), the standard of prejudice applied by the district court was inadequate.[2]

■ The court held that prejudice to Dufresne would be presumed because of the "number and quality" of counsel's errors. We do not reject the premise that prejudice (or a connection between a defendant's decision to plead guilty and counsel's errors) may be presumed in some cases in which counsel's ineffectiveness was of a type or so pervasive that specific prejudice (or an actual connection) cannot be or need not be shown, *see United States v. Golub,* 638 F.2d 185, 190 (10th Cir.1980), *rev'd on other grounds,* 694 F.2d 207 (10th Cir.1982); *United States ex rel. Green v. Rundle,* 434 F.2d 1112, 1115 (3d Cir.1970). We find, however, that the rule does not apply on the facts of this case. First, counsel's errors were not so pervasive that specific prejudice (or a specific connection), if it existed, could not have been shown. As we discuss below, the district court identified and delineated the specific errors committed by counsel such that Dufresne could and should have shown how those errors specifically prejudiced (or actually influenced) his decision to plead guilty. *See Cooper v. Fitzharris,* 586 F.2d 1325, 1332 (9th Cir.1978) (en banc), *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979). Second, the trial, although abbreviated, established a developed record in this case. The record helps to reasonably determine the impact of counsel's errors. *See id.* Finally, a claim that privately-retained counsel committed errors in pretrial investigation and preparation does not implicate the State in any wrongdoing. A presumption of prejudice (or of a connection between Dufresne's decision to plead guilty and counsel's errors) would not thus serve to deter unconstitutional conduct by the State but would merely "bestow an undeserved windfall" upon Dufresne. *Washington v. Strickland, supra,* 693 F.2d at 1260; *cf. Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (prejudice presumed in case of prosecutorial misconduct).

### III

■ Turning to the facts of this case, we find that Dufresne has failed to carry his burden of proof under either an actual prejudice or actual connection analysis.

The foremost error committed by Dufresne's trial counsel was his failure to recognize or appreciate that intoxication may be a defense to first degree murder or the basis for excluding a confession. For the following three reasons, we conclude that counsel's failure was not shown to have actually prejudiced or influenced Dufresne's decision to plead guilty.

First, under Rhode Island law as it existed at the time of trial, we do not believe that intoxication would have availed Dufresne as a defense to first degree murder or as a ground for suppressing his confessions to police. Until 1978, Rhode Island law placed the burden on a defendant to show by a preponderance of the evidence that intoxication rendered the defendant incapable of forming a specific intent in order to prevail on an intoxication defense.[3]

---

**2.** We believe the appropriate standard for this case under a prejudice analysis would have been that applied by the Fifth Circuit in *Washington v. Strickland, supra.* In *Washington,* the court held that to sustain the burden of proof on the issue of prejudice, a petitioner must show that ineffectiveness of counsel resulted in "actual and substantial disadvantage to the course of his defense." 693 F.2d at 1262. *See also United States v. Campa, supra,* 679 F.2d at 1014 (applying "actual prejudice" standard). In a guilty plea case such as this, it is the petitioner's decision to plead guilty that must be actually and substantially disadvantaged.

**3.** In 1978, the Rhode Island Supreme Court overruled this law in light of the United States Supreme Court decisions in *Mullaney v. Wilbur,*

*See State v. Duffy,* 112 R.I. 276, 308 A.2d 796, 801 (R.I.1973); *State v. Amaral,* 108 R.I. 755, 279 A.2d 428, 429–30 (R.I.1971); *State v. Murphy,* 107 R.I. 737, 271 A.2d 310, 315–16 (R.I.1970). Intoxication must be to such a degree as to "completely paralyze" the defendant's will, rob him of "the power to withstand evil impulses," and render "his mind incapable of forming any sane design." *State v. Amaral, supra,* 279 A.2d at 429–30. Similarly, to exclude a confession as involuntary on the basis of intoxication, a defendant must show that the alcohol overbore his will. *See State v. Cline,* 405 A.2d 1192, 1198 (R.I.1979). The cases indicate that proof of extreme intoxication is required before a confession will be excluded as involuntary. *See State v. Verlaque,* 465 A.2d 207, 210–11 (R.I.1983) (consumption of drugs and alcohol just prior to confession did not render confession involuntary where police testified that defendant's speech, conduct and actions did not appear impaired and alcohol was not detected on defendant's breath); *State v. Arpin,* 410 A.2d 1340, 1346 (R.I.1980) (the consumption of a half pint of whiskey, marijuana, and heroin "earlier in the day" did not render defendant's confessions involuntary).

At Dufresne's trial, three police officers testified that at the time he turned himself in at the police station, Dufresne appeared well controlled. One officer testified that Dufresne did not appear drunk and the odor of alcoholic beverages was not detectable on his breath. Against this testimony, Dufresne had only the testimony of the bartender at the Standard Tap that Dufresne appeared to "have had a drink," and the testimony of the doctor at St. Joseph's Hospital that Dufresne appeared inebriated seventeen hours after the shooting and fourteen hours after confessions to the police and that Dufresne was suffering a condition resulting from the consumption of alcohol approximately nine hours after the shooting and six hours after the confessions. We conclude that Dufresne was not actually prejudiced or affected by counsel's ignorance because he could not have carried his burden of proof on intoxication as a defense to murder or as a ground for excluding his confessions. We do not mean to suggest that a defendant must prove the guaranteed success of a possible defense or motion to suppress before prejudice from counsel's failure to raise the defense or make the motion may be established. Dufresne, however, was required to show a better possibility of success than was shown in this case. *Cf. United States v. Cooper,* 580 F.2d 259, 263 n. 8 (7th Cir.1978) (no showing of prejudice from counsel's waiver of insanity defense because defendant failed to make any showing that defense would have been meritorious).

Second, given the state of Rhode Island law at the time of trial, we find that even counsel who knew and appreciated the relevance of intoxication could have reasonably decided not to pursue the issue. Because counsel's decision not to pursue intoxication in this case was based on ignorance rather than a strategical choice, his conduct was incompetent. *See United States v. Bosch, supra,* 584 F.2d at 1121–22. Nevertheless, in determining whether that decision prejudiced or affected Dufresne, we may consider whether the same decision may have reasonably been made as a tactical choice. If competent counsel could have made the same decision, then it is difficult to find that counsel's incompetence actually affected the defendant's decision to plead guilty.

Finally, we find that competent counsel could have advised Dufresne and Dufresne could have knowingly and intelligently decided to plead to second-degree murder even if counsel had been able to suppress the confessions to police and had prepared an intoxication defense. The evidence

against Dufresne was overwhelming even without the confessions: there was the testimony of the victim's next-door neighbors that loud noises were heard just before Barbara Brophy saw Dufresne standing at the precise spot at which the crime occurred with a gun in his hand; there were the bullets recovered from the victim's body which matched the bullets in the gun that Dufresne turned over to police following the shooting; there was still Dufresne's confession to the bartender, Hathaway, that he shot his wife. In addition, a successful intoxication defense only would have reduced Dufresne's crime from first-degree murder to second-degree murder, and at the time the State offered the bargain to Dufresne there was no guarantee that the defense would be successful. Thus, even without the confessions in evidence and even prepared to advance a speculative defense that could reduce the crime to that agreed upon in the plea bargain, competent counsel could have reasonably advised Dufresne to accept the bargain and Dufresne could have reasonably decided to heed counsel's advice.

The district court also listed as incompetent counsel's failure to interview witnesses, visit the scene of the crime, or make an independent examination of the ballistics evidence. Again, however, Dufresne has failed to show that his decision to plead guilty was actually prejudiced or influenced by these errors. Dufresne has not alleged or shown any favorable evidence that might have been discovered from witness interviews which could have influenced his decision to plead guilty. *Cf. Morrow v. Parratt*, 574 F.2d 411, 413 (8th Cir.1978) (defendant's decision to plead guilty prejudiced by counsel's failure to conduct pretrial witness interviews where evidence indicated that witnesses would have corroborated defendant's claim that he was only an unwilling rider in the car used in the robbery). Nor does Dufresne allege any deficiency in counsel's cross-examinations of witnesses at trial. In fact, the trial transcript reveals that, whatever counsel's derelictions were prior to trial, counsel represented Dufresne vigorously and competently at trial. Although counsel did not examine the scene of the crime, he carefully cross-examined the witnesses who were there concerning their ability to perceive and their perception of events and circumstances. *See, e.g.,* Trial Transcript at 263–69 (cross-examination of Barbara Brophy). Finally, there is no indication that an independent ballistics examination would have revealed evidence other than that adduced from the government's expert.

In sum, we find that even given competent counsel, Dufresne would have faced at the close of the State's case virtually the same sum of evidence as he did face and would have been prepared to advance defenses that, at best, could only reduce his conviction from first-degree to second-degree murder. Even given competent counsel, Dufresne would have been well-advised to accept a plea of second-degree murder and a sentence of twenty-five years imprisonment.

## IV

We do not condone counsel's lack of pretrial diligence in this case. Murder in the first degree is a very serious charge. It demands and deserves a defense attorney's utmost diligence. Counsel in this case was under no obligation to defend Dufresne, but once he assumed that responsibility, he owed whatever effort was necessary to render vigorous and competent representation. At least in a habeas proceeding, however, we are unable to find counsel's incompetence alone sufficient to justify a withdrawal of a guilty plea. Because Dufresne has not shown that his decision to plead guilty was actually prejudiced or influenced by counsel's errors, we reverse the order of the district court and dismiss the petition for a writ of habeas corpus.