STATE

v.

**Keith A. ROBERTS et al.**

**No. 80–125–C.A.**

Supreme Court of Rhode Island.

Aug. 28, 1981.

---

Dennis J. Roberts, II, Atty. Gen., James P. Renaldo, Sp. Asst. Atty. Gen., for plaintiff.

John F. Cicilline, Oteri & Weinberg, Joseph S. Oteri, James W. Lawson, Judith H. Mizner, Boston, Mass., for defendants.

## OPINION

WEISBERGER, Justice.

Keith A. Roberts, George E. Conley, Francis X. Connolly, Robert W. Mauer, Michael J. Mauer, Marvin R. J. Odom, and Gregory P. Stevenson appeal from their convictions for possession of a controlled substance with intent to deliver and for conspiracy. The defendants were indicted on January 23, 1978. The indictment was based upon evidence obtained from a series of searches and seizures conducted by the Rhode Island State Police in the town of Jamestown and on Narragansett Bay on November 28–29, 1977.

A motion to suppress the evidence obtained from these searches and seizures was denied on April 30, 1979. Thereafter, a trial without the intervention of a jury was held on May 7, 1979, and defendants were found guilty on July 19, 1979. Judgments of conviction were entered and concurrent

sentences of five years were imposed upon all defendants on October 5, 1979.[1]

The defendants raise three major issues in challenging the searches and seizures upon which the prosecution's case is predicated. Varying groups or individual defendants challenge each of the searches and seizures. The relationship of the defendants to the several searches and seizures will be set forth as each incident is discussed.

## I

## THE CHALLENGE OF DEFENDANT ROBERTS TO EVIDENCE DERIVED FROM THE SEIZURE AND SEARCH OF HIS MOTOR VAN

On November 28, 1977, at approximately 9 p. m., Trooper David J. DeCubellis was on duty at the Wickford barracks of the Rhode Island State Police. He received a telephone call from a Mr. Jack Anderson, who reported that during the past two weeks he had observed suspicious activities in the vicinity of the house and land adjoining his premises on East Shore Road in Jamestown. Mr. Anderson had heard of smuggling activities taking place in Jamestown during the summer of 1977, and therefore he took special note of certain events on the neighboring property. He reported that "during the past week" trucks had left the adjacent property without lights and that on the night in question he had observed a sailboat, without running lights, motor in and moor to a dock on the adjacent property. He also heard a good deal of noise and talking in the vicinity of the dock. Upon receipt of this report, Officer DeCubellis notified his supervisor, Sergeant Bailey, who dispatched Trooper Theodore R. Davis, Jr., a State Police officer with seven and a half years' experience, to investigate.

As Davis headed toward the Anderson property, he saw a white van pass his cruiser traveling in the opposite direction. When he reached the foot of the Anderson driveway, Davis was met by Anderson who reported that the van which had passed Davis had just left the driveway of the residence next door, identified as the Sullivan residence, without lights. He stated that the driver had not turned the van's lights on until it had traveled a short distance down the road. Anderson also reported that the suspicious activity at the Sullivan residence had gone on for more than a week. He had heard during the late night and early morning hours the sound of engine noise from light and heavy trucks, which he observed departing without lights from the adjacent property. Anderson further stated that the Sullivan residence had a floodlight system the lights of which could be manually turned off but which otherwise went on and off automatically. He stated that on the nights of the suspicious activity, the lights were kept off. He stated that a sailboat had tied up at the dock on the property earlier that evening, and he believed from the starting of its auxiliary motor that it would soon depart. He described the boat as fifty to sixty feet in length with a single mast. Mr. Anderson also identified himself as a former member of the State Police.

During the course of the narrative, Trooper Davis drove his cruiser south along East Shore Road in the direction taken by the white van. He spotted the van headed toward the Jamestown Bridge. Accelerating his rate of speed, Trooper Davis overtook the van and blocked its path by pulling his cruiser across the bridge at a forty-five-degree angle. Another state trooper, Detective Esposito, who happened to be in the vicinity in his personal car, stopped his vehicle behind the van, thereby blocking off any avenue of retreat.

At this juncture Davis and Esposito approached the van, and Davis noted that it bore a Massachusetts registration containing certain digits that he had previously noted when he passed the van while going in the opposite direction. Through the closed window on the driver's side, Trooper Davis asked the driver for his license and

---

1. The five-year sentences in each case provided that three years would actually be served and two years would be suspended, with five years' probation to commence upon release on each count.

registration. The driver rolled down the window, turned on the interior light, and leaned over to the right side of the van to obtain his papers. Davis, who was less than a foot from the driver's window, became aware of an overpowering smell of marijuana with which odor he was familiar from having encountered it before in the course of police duties. He also observed from where he stood a large mattress partly covered by heavy burlap and located directly behind the driver. Trooper Davis noted that the burlap wrapping was the same color and texture as that used to cover bales of marijuana Davis had previously observed when he unloaded the contents of a van seized in connection with a recent drug arrest in North Kingstown.

The driver furnished a California license and a Hertz rental agreement that took the place of a registration. The driver, who was then identified as Keith Roberts, was placed under arrest for possession of marijuana. Trooper Davis looked into the van and was able, without lifting the mattress, to see several bales of marijuana. The truck was towed to the Wickford barracks, where it was later searched; it was found to contain twenty bales of marijuana.

The defendant Roberts moved to suppress the evidence derived from this seizure and search on the ground that the initial stop was constitutionally impermissible.

The Supreme Court of the United States has held that a motor vehicle operated on a public highway is not subject to random stops by police officers unless there is a reasonable suspicion "that either the vehicle or an occupant is otherwise subject to seizure for violation of law * * *." *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660, 673 (1979). A similar doctrine was enunciated in respect to investigatory stops by border patrol officers in *United States v. Brignoni-Ponce*, 442 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The principle that a police officer acting from suspicion but having less than probable cause might make a seizure or stop of an individual for limited investigative purposes was first enunciated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In that case an experienced police officer who observed suspicious activity by three men drew the inference that they were planning a daylight robbery and that they were armed and dangerous. Chief Justice Warren, speaking for the Court, determined that when a police officer, in the light of his experience, entertained a reasonable suspicion, less than probable cause, that a person or persons were engaged in criminal activity and that they were armed and dangerous, he might briefly detain such persons, direct questions to them, and if unsatisfied with the answers, might make a limited pat down or search in order to determine if such individuals were in fact possessed of weapons.

This concept was further expanded in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), in which the Court upheld a detention and search under circumstances in which the officer, in response to a tip, seized a pistol from the person of a suspect. It was undisputed that the tip from an informant was not sufficient to constitute probable cause but was sufficient to support the investigative detention and seizure of a weapon. In commenting upon this action by the officer, the Court observed:

> "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. * * * A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.* at 145–46, 92 S.Ct. at 1923, 32 L.Ed.2d at 616–17.

The foregoing analysis was used in the enunciation of the principle in *United States v. Brignoni-Ponce, supra*, "that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke

suspicion." 422 U.S. at 881, 95 S.Ct. at 2580, 45 L.Ed.2d at 617.

Most recently in *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), the Court again sought to define the elusive concepts of "articulable reasons" and "founded suspicion." Chief Justice Burger, in writing for the majority, suggested:

"The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person. * * * Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 418, 101 S.Ct. at 695, 66 L.Ed.2d at 629.

We have applied this doctrine in *State v. Halstead,* R.I., 414 A.2d 1138 (1980), and sought to establish its parameters in *State v. DeMasi,* R.I., 419 A.2d 285 (1980), *vacated,* —— U.S. ——, 101 S.Ct. 3072, 69 L.Ed.2d 948 (1981),[2] in both the majority and the dissenting opinions.

■ In the case at bar, applying the teachings enunciated in the foregoing opinions, we find that a pattern of events leading to an articulable and reasonable suspicion emerges. A reliable informant known to have police experience informs a trained State Police officer of suspicious activities next door to his residence. The movement of heavy trucks without lights, the docking of a large sailboat also without lights, the sustained activity over a period of more than a week, all lead to the deduction in the

light of knowledge of smuggling techniques that criminal activity is afoot. The informant and the officers were entitled to take into account the nature of the locale, the fact that controlled substances are frequently smuggled ashore from yachts or other intermediate-size craft, and that the residential portion of the Island of Jamestown is not generally an area in which heavy and light trucks would be engaged in sustained nocturnal traffic. Certainly, these events would properly lead to an articulable suspicion in respect to the white van as supportable and reasonable as the deduction of the border patrol officers in *United States v. Cortez, supra.*

■ As a consequence, we believe that the brief investigative stop by Trooper Davis of the white van driven by defendant Roberts was justified. His asking for license and registration came within the appropriate ambit of such an investigative encounter. Upon the lowering of the window, the smelling of the overpowering odor of marijuana, and the observing of the burlap-covered mattress, the articulable suspicion ripened into probable cause. The probable cause to believe that the vehicle contained a quantity of marijuana supported the arrest of Roberts and the seizure of the motor vehicle. *Adams v. Williams, supra; Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

Consequently, the trial justice was correct in denying the motion of defendant Roberts to suppress the evidence obtained as a result of the seizure and the later search of the van.

II

THE CHALLENGE OF DEFENDANTS ROBERT W. MAUER, MICHAEL J. MAUER, FRANCIS X. CONNOLLY, AND MARVIN R. J. ODOM TO EVIDENCE DERIVED FROM THE BOARDING AND SEARCH OF THE YACHT *SOJOURN*

■ After having arrested defendant Roberts, Officer Davis proceeded toward

---

**2.** Remanding for reconsideration in light of *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

the Wickford barracks. En route to this destination, the trooper radioed information concerning his arrest to the duty officer. He also reported that a sailboat which he believed to be involved in the drug activity was underway and headed toward the East Passage leading to the open sea. After receiving this information, Sergeant Bailey telephoned the Coast Guard and gave a description of the sailboat together with the information that it was believed to be involved in a smuggling operation. The Coast Guard requested that the State Police supply officers to assist in the operation. Lieutenant Miller and Trooper Almy were dispatched to Castle Hill. They embarked upon a Coast Guard cutter whose radar detected a vessel fitting the description given. This radar detected no other large boats within a sixteen-mile radius. Following the radar signal, the cutter came within visual distance and noted a sailboat approximately fifty-six feet in length with a single mast upon which one sail was bent. The sailboat was proceeding without lights in a southerly direction.[3] The cutter overtook the yacht. A Coast Guardsman gave the order to heave to and lower sail. The cutter was maneuvered into position and the State Police officers boarded the yacht. The troopers encountered two men on deck and in response to a request for identification, the men produced drivers' licenses showing them to be Robert Mauer and Marvin Odom. Lieutenant Miller was told that a third man was below deck. There he encountered Michael Mauer who opened his briefcase in response to a request for identification. Miller observed several shotgun shells in the briefcase. Upon further inquiry, Michael Mauer stated that there was a shotgun on board, and Miller asked to see it. Michael Mauer conducted the troopers to the bunk area, obtained the shotgun, and handed it over to the officers. During the travel below deck, Lieutenant Miller noted a strong odor of marijuana, a smell with which he was familiar from prior arrests. He also noted in the bunk area a residue of

marijuana on the slats of the port bunk. Thereupon, the three men were placed under arrest and charged with possession of marijuana. The *Sojourn* was towed to Goat Island. The yacht was moored at that location and a search warrant was obtained from a justice of the District Court. Pursuant to the warrant, a search of the yacht was made, and a quantity of marijuana was seized.

At the suppression hearing defendant Francis Connolly testified that he was the owner of the *Sojourn*, having purchased the yacht from a dealer in Fort Lauderdale, Florida, sometime during the month of September, 1977.

The defendants assert that the boarding of the *Sojourn* constituted an unlawful seizure of the vessel and further claim that the arrests of the persons on board were unsupported by probable cause. In their brief, defendants argue that the troopers who were dispatched to the Coast Guard cutter for the boarding operation were not possessed of sufficient information to warrant either an investigatory stop or a search of the *Sojourn*. In making this contention, defendants seek to segment and individualize the pieces of knowledge which the officers had. However, it has been recognized that the knowledge of officers engaged in a common investigation may be relied upon by fellow officers in establishing probable cause. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *State v. Duffy*, 112 R.I. 276, 308 A.2d 796 (1973). In this situation, the knowledge obtained by Trooper Davis must be added to the knowledge imparted to Sergeant Bailey, Lieutenant Miller, and Trooper Almy.

Davis had discovered an impressively large amount of marijuana in the van that he had earlier stopped and examined. This finding lent credence and probability to the reports given by Jack Anderson concerning the mysterious activity at the Sullivan residence, the presence of a large yacht, and its preparations for departure. Putting all of

---

**3.** Testimony of the Coast Guard witness indicated that a vessel of this type was required to display running lights at night.

these elements together, the State Police had probable cause to believe, when the elements are viewed in a commonsense rather than a hypertechnical manner, that a sizable smuggling operation was in the process of implementation. *See Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The officers also had probable cause to believe that contraband had been transferred from the yacht to the van for transportation to a point of further distribution.

Thus, a classic situation developed combining probable cause to believe that a moving vessel contained contraband with the exigency created by the probability that the vessel was headed toward the open sea. Probable cause together with exigency has long been recognized as an appropriate basis for the search of a mobile vehicle or ship. *See Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

Thus, the boarding and the search of the vessel were supported by probable cause. The finding of the marijuana by cursory inspection gave rise to probable cause to arrest the crew members who could by circumstances be inferred to possess the marijuana. *In re Caldarone*, 115 R.I. 316, 345 A.2d 871 (1975); *State v. Gilman*, 110 R.I. 207, 291 A.2d 425 (1972). Although the officers might well have been justified in a complete search of the vessel, they postponed the search once the exigency of mobility had been removed. It is questionable that the rigorous requirements laid down by *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), for repositories of personal effects were applicable, but those rigorous requirements were nevertheless observed. *See also Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *State v. Benoit*, R.I., 417 A.2d 895 (1980).

Consequently, the trial justice did not err in denying the motions of defendants Robert W. Mauer, Michael J. Mauer, Marvin R. J. Odom, and Francis X. Connolly to suppress evidence derived from the seizure and search of the *Sojourn*.

## III

THE CHALLENGE OF DEFENDANTS GREGORY P. STEVENSON, GEORGE E. CONLEY, AND FRANCIS X. CONNOLLY TO EVIDENCE DERIVED FROM THE WARRANTLESS ENTRY INTO THE SULLIVAN RESIDENCE

At about 10 p. m. Trooper DeCubellis was dispatched by Sergeant Bailey to go to the Sullivan residence on East Shore Road in order to make sure that no vehicles were leaving that location. About twenty-five minutes after DeCubellis arrived, he was joined by Captain Griffin, Sergeant Bailey, and Detective Blanchette. The two cruisers were driven along the driveway to a point near the house. After parking the vehicles, DeCubellis and Bailey noted someone moving inside the lighted house. The officers entered after knocking and announcing, "State Police." After entering, Detective Blanchette and Sergeant Bailey encountered a man on the second floor landing. He was arrested and later identified as Gregory P. Stevenson. Meanwhile, Trooper DeCubellis approached the south side of the house and observed a man coming out of a side door in a "duck-walk" posture. DeCubellis arrested the man and led him back into the living-room area. This man was later identified as George Conley. Subsequently, Sergeant Bailey and Captain Griffin walked about the grounds where they discovered several conveyor belts, certain burlap bales, and some movable carts. These items, together with other material inside the house, were seized pursuant to a search warrant that was later obtained from a justice of the District Court at 3:40 a. m. the following morning. Among other items, twenty wrapped bales of marijuana were seized. Each bale weighed approximately seventy-five to one hundred pounds. All of the bales were seized outside the house.

The defendants argue that the entry into the dwelling house and the arrest of the persons on or near the premises were constitutionally invalid. The state asserts that

probable cause to enter the dwelling house in order to arrest those inside did exist based upon probable cause to believe that they were involved in the drug activities.

In addressing this issue, we acknowledge that the collective information available to the officers gave rise to probable cause to believe that contraband in the form of marijuana was located within the dwelling house. Nevertheless, that probable cause could not form a basis for a warrantless entry. "Belief, however, well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant." *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409, 413 (1970) (*quoting Agnello v. United States*, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145, 149 (1925)). Thus, the probable cause to believe that the dwelling house contained a controlled substance could not support an entry without a warrant even on the supposition that the presence of such drugs might create its own exigency. *See Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Consequently, the warrantless entry must be supported, if supported at all, by probable cause to believe that the persons inside had committed a felony.

In enunciating his findings of fact on this aspect of the case, the trial justice stated: "At the time the police entered the building, the question arises was there then on the collective information available to the police, probable cause to believe that the occupants of the Sullivan property were involved in the criminal activity [marijuana smuggling] that had been under investigation? Probable cause is to be evaluated and judged on the basis of the collective information in the possession of the police at the time of the arrest, as the knowledge of each officer working in coordination in an attempt to solve a reported crime is the knowledge of all. * * It seems to me that on that particular evening at the time that these officers approached that building there was probable cause to believe that the occupants of that building were involved in criminal

activity. * * * I believe the officers' conduct to be reasonable; I believe it to be appropriate in all of the circumstances in investigating an actual crime which was then ongoing. There being probable cause to believe that they were involved, there certainly was probable cause to arrest even at the moment they entered."

■ In a case involving application of constitutional safeguards, this court is required to exercise its independent judgment, *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), but does not sit as a court of *nisi prius, State v. Smith*, R.I., 396 A.2d 110 (1979), and therefore must give due deference to the trial court's determination of historical fact. *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).

■ In the exercise of our independent judgment, we believe that there was adequate evidence to support the trial justice's determination that upon the arrival of the officers in the vicinity of the Sullivan property, the following collective information was available to establish probable cause: (1) mysterious nocturnal activity had been going on on the Sullivan property for more than a week; (2) this activity included movement of heavy and light trucks into and out of the Sullivan property, which movement occurred without lights and under cover of complete darkness, although a floodlight system was available; (3) a large yacht maneuvering without lights had been moored at the Sullivan property dock during these operations; (4) a state trooper had discovered in a van leaving the Sullivan property a large quantity of marijuana; and (5) the yacht was headed without lights for the open sea. From these circumstances the trial justice is entitled to draw the inference (as were the officers) that a major marijuana smuggling operation was in progress. The trial justice could also infer (as might the officers) that no persons would be permitted on the Sullivan property, in the house or elsewhere, unless they were part of the smuggling enterprise. Drawing these inferences, the trial justice properly determined that there was proba-

ble cause to believe that any occupants of the house were engaged in the felonious enterprise of smuggling contraband and that the enterprise included a significantly far-ranging conspiracy.

Thus, when the officers saw a person through the window of the house, they had probable cause to believe that one or more persons engaged in this enterprise were within.

Without question, the recent case of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), limits to exigent circumstances the authority of the police to enter a suspect's dwelling house in order to effectuate arrest without a warrant. This case had not been decided at the time when the trial justice passed on the motion to suppress or at the time of the trial on the merits. The *Payton* opinion enunciated a new rule of law which had not previously been part of our constitutional code of procedural safeguards, although the Court had expressed doubt about warrantless entry into a dwelling house to effect an arrest earlier in *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). However, in *Santana* the arrest had been initiated in a public place, and therefore, the holding of *Santana* was limited to the determination that the suspect could not defeat the arrest begun in a public place by retreating into her dwelling house. Thus, the entry into the dwelling house in that case was authorized under the hot-pursuit doctrine of *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). The Court in *Payton* acknowledged that twenty-four states by statute or court decision allowed police to enter a dwelling house without a warrant when the officers had probable cause to arrest a person within. Indeed, the Supreme Court of the United States had itself in recent years approved the warrantless entry, on probable cause to arrest, into a dwelling even though the person within turned out to be the wrong man. *Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971).

Consequently, it is scarcely surprising that the trial justice in the course of the motion to suppress did not make any findings of fact in regard to the presence or absence of exigent circumstances that would be required under the *Payton* doctrine.

We believe that it is essentially unsound practice for an appellate court to attempt to glean from a record facts that have not been found by the trial justice and which were not the subject of a specific evidentiary predicate in order to determine whether a constitutional standard unknown at the time of the trial had been properly applied. As a consequence, we shall remand this case to the trial justice in order that he may receive evidence on the question of presence or absence of exigent circumstances in the light of the *Payton* doctrine and in order that he may make the requisite findings of fact and rulings of law pursuant thereto. In the event that the trial justice should find that the entry into the Sullivan dwelling house was constitutionally impermissible, he may then determine the specific items of evidence which should have been suppressed as a result of such entry. Thereafter, the trial justice may consider whether or not the failure to suppress such evidence would require a new trial of one or more of the defendants. In the event that the trial justice finds the entry to have been supported by exigent circumstances, the affected defendants may, if they see fit, seek further review by this court. Otherwise their convictions shall stand.

For the reasons heretofore expressed, the defendants' appeals are denied and dismissed in respect to issues I and II dealt with herein, and the case is remanded to the Superior Court for further proceedings in respect to issue III in accordance with this opinion.

BEVILACQUA, Chief Justice, dissenting.

I disagree with the majority's result that the case should be remanded for the purpose of having the trial justice make specific findings concerning the presence of exigent circumstances that would have validated the warrantless entry into the dwelling.

The trial court held a hearing on defendants' motion to suppress the evidence that resulted from the warrantless entry. All the evidence surrounding the activities of all parties on the evening in question was fully developed at that hearing. The record clearly indicates this, therefore rendering it unnecessary for this court to require further factfinding in order to make a determination regarding the presence of exigent circumstances. Furthermore, such a hearing would not disclose any new evidence that would support a finding of exigent circumstances.

Notwithstanding the recent decision of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 629 (1980), the law was well settled that warrantless arrests, entries, or searches were not generally approved or looked upon with favor. *See Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142, 147 (1964); *Chapman v. United States*, 365 U.S. 610, 615, 81 S.Ct. 776, 779, 5 L.Ed.2d 828, 832 (1961). Thus, the issue before the trial justice at the hearing on the defendants' motion to suppress was whether the police had sufficient reason to enter the dwelling without a warrant. *See Johnson v. United States*, 333 U.S. 10, 14–15, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440–41 (1948). The results of that hearing indicated that all the evidence was presented and that the state offered no evidence to justify police entry into the Sullivan residence. An evidentiary hearing would be necessary if there had been a failure to provide the state an opportunity to present the circumstances involving the warrantless entry, or if the record was devoid of sufficient facts to enable this court to make a meaningful review, but such is not the case here. Simply stated, the facts justifying a warrantless entry into the dwelling were not evident from the record because they did not exist.