STATE

v.

**Frederico ORTIZ, Jr.**

No. 90–600–C.A.

Supreme Court of Rhode Island.

May 12, 1992.

**922**

James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

MURRAY, Justice.

This case comes before us on appeal by the defendant, Frederico Ortiz, Jr. (Ortiz), from his conviction of breaking and entering without consent, unlawful possession of a knife, possession of burglary tools, and possession of marijuana. Ortiz contends that the trial justice committed several errors that mandate a new trial. A summary of the facts of this case is as follows.

Ortiz and Robert Page (Page) were indicted on June 8, 1989, for burglary of a dwelling house in violation of G.L.1956 (1981 Reenactment) § 11–8–1, possession of burglary tools in violation of § 11–8–7, possession of a knife having a blade more than three inches in length while committing a crime of violence in violation of G.L.1956 (1981 Reenactment) § 11–47–59, as amended by P.L.1988, ch. 248, § 1, and resisting arrest in violation of G.L.1956 (1981 Reenactment) § 12–7–10, as amended by P.L. 1985, ch. 114, § 1. In addition, Ortiz was indicted for possession of marijuana in violation of G.L.1956 (1982 Reenactment) § 21–28–4.01(C)(1)(b), as amended by P.L. 1988, ch. 521, § 1, and Page was indicted for possession of cocaine in violation of § 21–28–4.01(C)(1)(a).

Pretrial motions were heard on January 8 and 9, 1990. Both defendants filed motions to sever which, after argument, were denied by the trial justice. Ortiz pressed a motion to suppress Officer William Sedoma's extrajudicial and in-court identifications of Ortiz, and the marijuana discovered on defendant's person. He argued that because they were fruits of illegal police activity, namely, the investigative stop of the taxicab in which Ortiz was riding, they were inadmissible. Again, after extensive argument, these motions were denied.

Trial commenced before a jury sitting in Newport County January 10, 1990. On January 18, 1990, the trial justice granted

defendants' motions for judgment of acquittal on the burglary charges. Page was found guilty of all charges except resisting arrest. On January 19, 1990, the jury returned with guilty verdicts against Ortiz on breaking and entering without consent (which the trial justice charged as a lesser included offense of burglary), possession of a knife having a blade more than three inches in length while committing a crime of violence, possession of burglary tools, and possession of marijuana. The jury found Ortiz not guilty of resisting arrest. On March 23, 1990, the trial justice denied Ortiz's motion for a new trial. On April 27, 1990, Ortiz was sentenced to ten years with six to serve for breaking and entering; ten years suspended to run consecutively for possession of burglary tools; five years suspended for possession of a knife and one year to serve for possession of marijuana, both to run concurrent with the ten-year sentence for breaking and entering. Ortiz filed his appeal with this court on May 17, 1990.

Renee Sousa (Renee) was the first witness to testify at trial on behalf of the state. Her testimony is summarized as follows. On December 15, 1988, Renee lived at 644 Brayton Road in Tiverton, Rhode Island with her husband and three children. Between the hours of nine and ten on that night Renee was at home with her youngest daughter, Sarah. Renee was in her bedroom reading, and Sarah was asleep in her bedroom, when Renee heard a car drive up the driveway of her house, honking its horn repeatedly. Renee went into Sarah's bedroom and looked out a window that overlooked the driveway in an attempt to ascertain who was causing such commotion. She observed an unfamiliar, small, gray car with its lights on drive up to the garage door of the house. The driver, an unfamiliar male, approached the front door of the house. Renee described the driver as a heavy man of medium weight wearing a felt hat and a three-quarter-length camel's-hair coat. This man was later identified as Page. Page began pounding on the front door of the house. While Renee was at the top of the staircase she asked who was there, however, she received no response. Renee then went back to Sarah's bedroom, observed Page reenter the car and turned the car around, causing it to face Brayton Road. At this point Renee initiated a 911 emergency call, summoning police. She told the operator that there were two men outside her house whom she did not recognize. By this time, Sarah was awake.

While Renee was on the phone, she heard noises downstairs that she described as "shuffling." Renee further described the noises as that which sounded as though something was being dragged across the floor, and as if things were being removed from the house. Renee then heard footsteps coming up the staircase. At that point Renee and Sarah shut the bedroom door, and moments later observed the handle on the bedroom door begin to turn. They exerted pressure on the door in order to prevent the intruder from entering the bedroom. In the meantime Renee frantically asked who it was but, again, received no response. They then heard Page go back downstairs and outside.

Renee again observed from the bedroom window overlooking the driveway. She saw Page exit the house and wave his arms to the passenger of the car. At this point, Renee again attempted to call for police assistance. However, when she picked up the phone there was no dial tone. It was later determined that the phone lines had been severed. Renee observed Page get back into the car. She could not recall, though, from which side he entered the car, or if he was driving the car. The driver of the car began to drive away without the car lights on, but he never reached the end of the driveway. The driver of the car failed to round the curve of the driveway and drove the car into a ditch adjacent to the driveway. It was at this point the police arrived on the scene.

On cross-examination, Renee stated that she did not make a close observation of the passenger in the car, but testified that he was in the car at all times while the car was under her observation. Renee stated, however, that there were times during the

course of events when the car was not under her observation.

There was also testimony given relating to Renee's emotional state during the incident. Over defense counsel's objection, Renee testified that during the incident she was "very scared, not so much for [herself], but especially for [her] daughter." Renee's daughter, Sarah, also testified on behalf of the state. Over defense-counsel's objection Sarah stated that, while her mother was looking out her bedroom window, she "sounded scared and she just looked at [her] like she was going to die, like something was going to happen."

Officer Sedoma also testified on behalf of the state. His testimony is summarized as follows. Officer Sedoma had been a member of the Tiverton police department for ten years at the time of the incident. He was the first officer to arrive at the Sousa residence on the night in question. Officer Sedoma was instructed to report to 644 Brayton Road, the Sousa residence, to investigate a report of a suspicious vehicle in the driveway. He slowly approached the Sousa house, stopped briefly at the mailbox, and then turned into the driveway. The officer observed a car approximately forty to fifty feet to his right off the edge of the driveway in a ditch. He then positioned his cruiser in order to get closer to the vehicle, and so the cruiser was facing the vehicle. The officer put on the "overhead take down lights" (spotlights), focused them in the direction of the vehicle, and observed two male subjects standing outside the vehicle. The officer noted that the vehicle was up against a small tree, with two doors open on each side, and that the interior lights were on. Officer Sedoma also noted that the car engine was on.

As previously stated, the two males were standing outside the vehicle. One of the men, Page, Sedoma eventually placed in handcuffs and placed under arrest. Officer Sedoma described Page as wearing a dark, three-quarter-length overcoat type of jacket. The officer described the second man, (later identified as Ortiz), as smaller and thinner than Page, with a dark complexion. Officer Sedoma testified that this man was wearing a purplish baseball-type jacket and a baseball cap-type hat. The officer approached the vehicle, drew his service revolver, and ordered both men to put their hands on the rear of the car. Page then started to walk around the rear of vehicle, move in the officer's direction, and begin talking to him. At this point Officer Sedoma observed the second man move towards the driver's side of the vehicle, and the officer stated, that "it appeared that he had thrown something into the vehicle." Simultaneously, Page was stating to the officer that "everything is okay, [m]y car went off the road." Officer Sedoma again ordered the men to place their hands on the vehicle.

Officer Sedoma returned to his cruiser and called for assistance. He then approached the suspects. While handcuffing Page, Officer Sedoma observed the other man, Ortiz, begin to walk backward into the woods. The officer ordered him to stop, but Ortiz ran off into the woods in a southerly direction. Officer Sedoma pursued him for a short time but he returned to his cruiser when he noticed Page putting his free hand inside the trunk of the car. When other officers arrived on the scene, Sedoma instructed them to begin searching the area south of the house for a black male wearing a baseball cap. The police searched for approximately one hour with no results.

After searching for the suspect at large for thirty to forty-five minutes, Officer Sedoma returned to the Sousa residence. He then returned to the car in order to turn off its engine. As the officer reached into the car to shut off the engine, he looked down at the floor on the driver's side of the car and observed a large buck knife partially in its case. As he looked over to the passenger side of the car, he observed another buck knife on the floor of the passenger front seat. Also on the passenger-side floor, Sedoma observed a pair of channel-lock pliers, a pair of tin snips and a regular screwdriver. The officer testified that these items are commonly used in housebreakings. Sedoma returned to police headquarters to complete his required paperwork, to impound the vehicle, and to

perform booking proceedings on defendant Page.

Approximately one-and-one-half hours after the incident, Officer Sedoma and Officer Charles Mulcahey were on their way back to the Sousa residence to interview the victims. While en route the officers heard a radio dispatch concerning a taxi cab that appeared to be lost in the area. Though they were not instructed to intercept the taxicab, upon observing it drive up and down streets in the area, the officers stopped the taxicab and inquired as to its purpose. The taxicab driver told the officers that he was trying to locate 8 Poinsetta Way, which was approximately one-and-one-half miles from the Sousa residence. In response to the officers' inquiry as to the character of the cab's fare, the taxicab driver responded that he had been summoned to pick up a one-person fare. Officer Sedoma then gave the driver directions to Poinsetta Way. Officer Sedoma testified that it was unusual for a taxicab to be in this residential area at that time of night and that he felt "suspicious." He then followed the taxicab to the residence where it was to pick up its fare, and parked his cruiser nearby.

The cab driver sounded his horn, and shortly thereafter, Officer Sedoma observed a male walk from the house and get into the taxicab. The officer could not tell whether the man exited the house or came from the vicinity of the house. The officer could not see what the man was wearing because of the distance and darkness. However, Officer Sedoma testified that the man was not wearing a baseball cap. Officer Sedoma observed the man get into the back seat of the taxicab, which then proceeded out of Poinsetta Way. At that time, Officer Sedoma immediately pulled up, activated his spotlights, and blocked the path of the taxicab. The officer approached the taxicab and observed that the man in the back seat of the cab was, in fact, the man that fled earlier, Ortiz. The two officers approached the cab and asked Ortiz to alight from the cab. When Ortiz did not comply, the officers forced him out of the vehicle and proceeded to arrest him. A later search of Ortiz at the police station uncovered a glassine bag in his pocket, the contents of which were later analyzed and determined to be marijuana.

The defendant raises four issues in this appeal, which we shall consider in the order in which they appear in his brief.

■ The first argument advanced by defendant raises a Fourth Amendment search-and-seizure issue. Ortiz contends that the police officers did not have reasonable suspicion based on clear and articulable facts that either the driver or passenger of the taxicab was involved in criminal activity. Ortiz argues that absent such, the officer lacked the quantum of suspicion necessary to conduct an investigatory stop. Ortiz further argues that: (1) the marijuana discovered as a result of the stop should have been suppressed by the trial justice as fruit of the poisonous tree, and (2) Officer Sedoma's extrajudicial identification, as well as his in-court identification, should not be admitted because they are fruits of illegal police activity, referring to the investigatory stop. The trial justice rejected these arguments at the suppression hearing below, concluding that the police actions were reasonable and proper in light of the attendant circumstances. Upon review of a trial justice's decision on a motion to suppress, deference is given to the findings of the trial justice, and those findings shall not be disturbed unless they are clearly erroneous. *In re Kean*, 520 A.2d 1271, 1276 (R.I.1987); *In re John*, 463 A.2d 174, 176 (R.I.1983).

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court enunciated the principle that a police officer can stop and briefly detain a person for investigative purposes absent probable cause if the officer has a reasonable suspicion based on specific and articulable facts, and reasonable inferences that can be drawn therefrom. The Court later expanded this principle in *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981), and held that in evaluating the constitutionality of a stop, the "totality of the circumstances—the whole picture—

must be taken into account." The *Cortez* Court set forth two elements that must be utilized in determining whether there existed the necessary particularized suspicion:

> "First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions * * * that might well elude an untrained person. * * * Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 418, 101 S.Ct. at 695, 66 L.Ed.2d at 629.

The *Cortez* analysis has been adopted by this court in several cases. *State v. Tavarez*, 572 A.2d 276, 278 (R.I.1990); *In re John N.*, 463 A.2d 174, 177 (R.I.1983); *State v. DeMasi*, 448 A.2d 1210, 1212 (R.I. 1982), *cert. denied*, 460 U.S. 1052, 103 S.Ct. 1500, 75 L.Ed.2d 931 (1983); *State v. Roberts*, 434 A.2d 257, 261 (R.I.1981). An application of the totality-of-the-circumstances analysis to the facts of this case leads us to conclude that the investigatory stop was constitutional.

Ortiz contends that what little information the officer had at the time of the intrusion was insufficient to form reasonable suspicion. In his brief Ortiz singled out facts known to the officer and offered case law supporting his position as to each individual fact. For example, in addressing the issue of whether it was unusual for a taxicab to be in the area of the crime, and whether based on that determination, the officer could form reasonable suspicion, Ortiz cites our decision in *State v. Halstead*, 414 A.2d 1138 (R.I.1980). In *Halstead* we found an investigatory stop constitutional where officers observed a rental truck in a high-crime neighborhood late at night proceeding very slowly, and where the occupants of the truck simultaneously gawked at the officers for an unusual period of time. There we concluded that the forementioned facts, when taken together and considered from the standpoint of an experienced officer, were sufficient to create a reasonable suspicion. Ortiz suggests that the facts of this case do not rise to the level of the facts in *Halstead* because there was no furtive behavior on the part of the occupants of the car. Thus, Ortiz contends, the officer lacked the bases for reasonable suspicion under the *Halstead* analysis. Next defendant addresses the lapse of time between the crime and the investigatory stop, and the distance between the scene of the crime and the location where the taxicab was stopped. The defendant cited *Ross v. State*, 419 So.2d 1170 (Fla.Ct.App.1982), for the proposition that because a defendant was at a location opposite the direction in which the officer observed him flee from the scene of the crime, the officer could not reasonably expect that this person could be that suspect. The defendant next cited *Alfred v. State*, 61 Md.App. 647, 487 A.2d 1228 (1985), for the proposition that an officer cannot, in performing an investigatory stop, rely solely on the defendant's proximity to the scene of the crime. Finally, defendant Ortiz asserts that because his actions as he left the house and entered the cab were not at all furtive the officer had no basis to form a reasonable suspicion. The defendant cited *State v. DeMasi*, 448 A.2d 1210 (R.I.1982), a case in which occupants of the car acted suspiciously by repeatedly looking back at the police car and were later stopped as a result of that suspicious behavior.

The defendant is correct in suggesting that an examination of any one of these factors does not by itself prove illegal conduct. However, a series of noncriminal acts will quite frequently serve as the basis for reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9, 109 S.Ct. 1581, 1586–87, 104 L.Ed.2d 1, 11–12 (1989). "In making a determination of [reasonable suspicion] the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* at 10, 109 S.Ct. at 1587, 104 L.Ed.2d at 12 (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76

L.Ed.2d 527, 552 n. 13 (1983)). These otherwise innocent acts, when observed as a whole by a trained and experienced law-enforcement officer aware of other pertinent information, allow that officer to "draw inferences and make deductions—inferences and deductions that might well elude an untrained person." *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695, 66 L.Ed.2d at 629. A review of the record reveals that that is precisely what happened in this case.

■ Officer Sedoma was the first officer to arrive on the scene of the crime. He observed a male flee into the woods and escape on foot, and later had the vehicle in question impounded. The officer was quite cognizant of the fact that the suspect would need transportation, and that the neighborhood lacked public transportation. When the officer observed the taxicab in the area and ascertained that it was picking up a single-person fare, he became suspicious and followed the cab. Upon observing a male enter the cab, the officer's level of suspicion increased. Taking into account the aforementioned facts, with the proximity and timeframe, the officer concluded that there was a reasonable likelihood that the man in the taxicab was, in fact, the fleeing suspect. The facts upon which the officer based his suspicion are specific and well articulated and warrant the officer's belief that the action he took was permissible.

The officer's purpose in stopping the taxicab was simply to identify the passenger, and it was only after his positive identification which provided the basis for prob-

able cause, that further, more intrusive action was taken. "The intrusion upon privacy associated with this stop was limited and was 'reasonably related in scope to the justification for [its] initiation.'" *Cortez*, 449 U.S. at 421, 101 S.Ct. at 697, 66 L.Ed.2d at 631 (quoting *Terry v. Ohio*, 392 U.S. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 910). Thus we hold that the officer had a reasonable basis to suspect that the passenger in the taxicab was the fleeing suspect, and that he had, therefore, the quantum of suspicion necessary to conduct an investigatory stop. Accordingly the trial justice was correct in denying defendant's motion to suppress the marijuana found as a result of that stop, and in admitting into evidence both identifications made by Officer Sedoma.

The defendant's second challenge is to the propriety of the trial justice's instructions to the jury regarding the possession-of-burglary-tools charge. Section 11–8–7, upon which the possession indictment is based, provides in pertinent portion, that it is a crime for a person to possess implements knowing that they are adapted and designed for cutting through, forcing, breaking open, or entering a building *"in order to steal therefrom money or other property, or to commit any other crime,"* with the intent to use them for that purpose.[1] (Emphasis added.) Count 2 of the indictment, based on § 11–8–7, however, alleged that defendant possessed implements designed and adapted for entering a building "in order to commit the crime of *burglary.*"[2] (Emphasis added.) However, the trial justice in his instruction to the

---

1. General Laws 1956 (1981 Reenactment) § 11–8–7 reads as follows:

   "Making, repairing, or possessing burglar tools.—Whoever makes or mends, or does any work connected with the making or reparation of, or has in his possession any engine, machine, tool, false key, pick lock, nippers, or implement of any kind adapted and designed for cutting through, forcing, breaking open or entering a building, room, vault, safe, or other depository, in order to steal therefrom money or other property, or to commit any other crime, knowing the same to be adapted and designed for the purpose aforesaid, with intent to use or employ, or allow the same to be used or employed, for

   such purpose, shall be imprisoned not more than ten (10) years."

2. The possession-of-burglary-tools count of the indictment charged that:

   "Frederico Ortiz, Jr. * * * did have in his possession, to wit, tin snips, screwdrivers and pliers, implements adapted and designed for cutting through, forcing, breaking open and entering a building, room, vault, safe and other depository in order to commit the crime of burglary, knowing the same to be adapted and designed for the purposes aforesaid, with intent to use and employ them for such purpose, in violation of § 11–8–7 of the General Laws of Rhode Island 1956."

jury paraphrased both the indictment and the statute, stating:

"Count 2 of the Indictment reads as follows. And again this is only the pertinent parts of the Indictment. I'm not reading them verbatim to you because it doesn't matter. That Frederico Ortiz, Jr. ... did have in his possession, to wit, tin snips, screwdrivers and pliers, implements adapted and designed for cutting through, forcing, breaking open, and entering a building, room, vault, safe and other depository *in order to commit a crime,* knowing the same to be adapted and designed for the purposes aforesaid, with intent to use and employ them for such purpose in violation of 11–8–7 of the General Laws. That statute 11–8–7 is entitled, 'Making, repairing, or possessing burglar tools.' The operative part for purposes of this case is possessing burglar tools. 'Whoever has in his possession any tool, false key, pick lock, nippers, or implement of any kind adapted and designed for cutting through, forcing, breaking open or entering a building *in order to steal therefrom money or other property, or to commit any other crime,* knowing the same to be adapted and designed for the purpose aforesaid, with intent to use or employ, or allow the same to be used or employed, for such purpose, shall be guilty of an offense of possession of burglary.'" (Emphasis added.)

The trial justice then explained to the jury that it must find beyond a reasonable doubt each element of the crime.

The defendant argues that the jury should have been instructed that the state had to prove intent to commit the crime of burglary, as set forth in the indictment. The defendant contends that the instruction permitted the jury to return a verdict of guilty without having to find that Ortiz harbored such intent. The defendant also contends that the trial justice committed reversible error because his instruction constituted an improper amendment of the indictment. We agree.

■ It is incumbent upon the state to prove beyond a reasonable doubt each and every element of the offense charged. *See State v. O'Rourke,* 121 R.I. 434, 439, 399 A.2d 1237, 1240 (1979); *State v. Koohy,* 105 R.I. 197, 201, 250 A.2d 711, 714 (1969). The statute upon which the indictment was based speaks in general terms on the intent element. The indictment, however, charged that Ortiz possessed certain tools in order to commit the crime of burglary. Thus the intent to commit the crime of burglary is an essential element of the offense charged against Ortiz in count 2. To determine whether the jury was advised of the state's burden in this respect, we must examine the trial justice's instructions in context, as part of the whole, and ascertain whether such would be construed by a jury composed of reasonably intelligent laypersons. *O'Rourke,* 121 R.I. at 439, 399 A.2d at 1240. A close examination of the trial justice's instructions reveals that the jury was not apprised of the state's burden to prove the intent element as charged in the indictment. The trial justice paraphrased the indictment and substituted in place of the specific-intent element a general-intent element similar to that found in the statute. This instruction allowed the jury to find defendant guilty upon proof that he intended to commit a crime other than the crime of burglary as set forth in the indictment. This instruction, therefore, was defective and the conviction on the possession-of-burglar-tools count cannot stand.

The defendant's third contention is that the evidence is legally insufficient to sustain verdicts of guilt on the charges of breaking and entering without consent, unlawful possession of a knife and possession of burglary tools. We disagree. A scrutiny of the record convinces us that the evidence and the reasonable and legitimate inferences drawn therefrom sufficiently support each verdict.

■ With respect to the breaking-and-entering charge, there was competent evidence to establish beyond a reasonable doubt defendant's participation in the commission of the crime. The jury was presented with evidence that Ortiz was seen by Renee sitting in Page's car, and

that at one point Page erratically waived his arms at Ortiz, perhaps signaling that their plan of action had gone awry. The jury also heard testimony that at some point while Page was in or around the house, the telephone wires were severed. The sequence of events as previously described certainly supports the inference that it was defendant Ortiz who severed the wires. Officer Sedoma testified that he saw Ortiz throw "something" into the car, and that the officer later found burglary tools in and around the car seat in which Ortiz had been seen. Finally, the jury heard testimony of Ortiz's flight from the scene of the crime. We agree with defendant that flight alone is not evidence of guilt, and that mere presence at the scene of a crime does not prove criminal participation in the commission of the crime. *See State v. Cooke,* 479 A.2d 727, 732 (R.I.1984) (and cases cited therein). However, these are factors that are considered as part of the whole context to determine a defendant's guilt or innocence. *Id.* at 732–33. From the evidence on the record we are persuaded that the evidence and reasonable and legitimate inferences sufficiently establish beyond a reasonable doubt that Ortiz participated in the crime of breaking and entering without consent.

■ Similarly, we believe that the evidence and inferences drawn therefrom sufficiently support a verdict of guilty on the charges of unlawful possession of a knife and possession of burglary tools. In *State v. Colbert,* 549 A.2d 1021, 1023 (R.I.1988), we stated that "possession within the context of a criminal statute means an intentional control of an object with knowledge of its nature." Again the evidence showed that Ortiz was sitting in the passenger seat of the car and that there were several burglary tools and two knives over three inches in length around that seat. And as previously stated the evidence presented forms a sufficient basis from which the jury could find that Ortiz severed the telephone wires. A reasonable inference can be drawn that Ortiz utilized one of the tools to sever the wires. In addition the jury heard Officer Sedoma testify that he observed Ortiz throw "something" into the

car, and a later search of the car revealed several burglary tools in and around the passenger seat. Thus we believe that the record is replete with evidence from which a jury could find that Ortiz intentionally exercised domination and control over the knives and tools with an intent to commit a crime.

■ The defendant's fourth argument is that the trial justice committed reversible error in allowing into evidence testimony relating to Renee's emotional state during the incident. The trial justice allowed, over defense-counsel's objection, Renee to testify that she was "very scared," not so much for herself "but especially for her daughter," Sarah. The defendant contends that this testimony is irrelevant and highly prejudicial. The trial justice allowed the testimony because he believed it was information that was necessary in order for the jury to assess her credibility. However, defendant argues that Renee's credibility was not in issue, and therefore, the testimony only served to arouse the jury and prejudice defendant.

We agree with the trial justice's determination that the testimony assisted the jury to assess Renee's credibility, specifically her ability to recount the events in question. Furthermore, we believe that the remarks made by Renee were nonprejudicial. We have stated that "[w]hether a particular statement is prejudicial cannot be determined by a fixed formula." *State v. Pugliese,* 117 R.I. 21, 26, 362 A.2d 124, 126 (1976). We must "evaluate its probable effect upon the outcome of the case by examining the remark in its factual context and determining whether this remark reasonably tended to increase" the probability of an issue of fact or law that is of consequence to the outcome of the case. *Id.* at 26, 362 A.2d at 126–27. It is our opinion that the challenged remark is nonprejudicial. The fact that a woman who is faced with an intruder in her home, with her young daughter by her side, was "very scared" could not have shocked a reasonable juror. It is doubtful that a remark of this nature improperly aroused or influenced the jury, or distracted the jury from

the issues before it. Thus we agree with the trial justice that Renee's remark was nonprejudicial.

■ Lastly, defendant argues that the trial justice committed reversible error in allowing Renee's daughter, Sarah, to testify that, while her mother was looking out her bedroom window, she "sounded scared and she just looked at [her] like she was going to die, like something was going to happen." Ortiz argues that this testimony constituted inadmissible lay opinion testimony. We disagree.

This court has adopted a two-part test for the admission of lay opinion testimony: (1) "the lay witness must have had an opportunity to view the person or event at issue" and (2) "the lay witness must be able to 'give concrete details on which the opinion was founded.'" *State v. Cohen,* 538 A.2d 151, 153 (R.I.1988); *State v. Rondeau,* 480 A.2d 398, 401 (R.I.1984); *State v. Bowden,* 473 A.2d 275, 280 (R.I.1984). Sarah's testimony in the case at bar clearly satisfies both parts of this test. Sarah was by her mother's side throughout the entire episode, and hence was able to offer details upon which she opined that her mother was in such a high state of anxiety. Accordingly the trial justice correctly ruled Sarah's testimony relevant and admissible.

Having reviewed each of the issues raised by the defendant on appeal, we are of the opinion that only one of the issues has merit. We agree with the defendant that the trial justice committed reversible error in instructing the jury on the possession-of-burglary-tools count of the indictment.

Therefore, the defendant's appeal of his conviction on count 2 of the indictment is sustained, and the judgment of conviction on count 2 is vacated. The defendant's appeal of his convictions on counts 1, 3, and 4 is denied and dismissed, and the judgment of convictions appealed from as to those counts is affirmed. The case is remanded to the Superior Court for further proceedings.